IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

───────────────────────────────────────────────────────

UNITED STATES OF AMERICA,          |
                                   |
                Plaintiff,         |
                                   |
VS.                                | No. 10-10090
                                   |
FREDERICK COLE,                    |
                                   |
                Defendant.         |

───────────────────────────────────────────────────────


TRANSCRIPT OF SENTENCING

BEFORE THE

HONORABLE S. THOMAS ANDERSON


JUNE 22, 2012


MARK S. DODSON
OFFICIAL COURT REPORTER
167 N. MAIN STREET – SUITE 1132
MEMPHIS, TENNESSEE 38103


UNREDACTED TRANSCRIPT

1

2                              – A–P–P–E–A–R–A–N–C–E–S –

3

For the Plaintiff:

4
                              MATTHEW J. WILSON
5                             ASSISTANT U.S. ATTORNEY
                              109 S. HIGHLAND AVENUE
6                             3RD FLOOR FEDERAL BUILDING
                              JACKSON, TN 38301
7

8

For the Defendant:

9
                              C. MARK DONAHOE
10                            P.O. BOX 98
                              JACKSON, TN 38302
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              UNREDACTED TRANSCRIPT

1                    W I T N E S S   I N D E X

2         WITNESS                                    PAGE LINE
      ------------------------------------------------------------
3
   RODNEY WEAVER                                      8     1
4     DIRECT EXAMINATION BY MR. WILSON:               8     5
      CROSS-EXAMINATION MR. DONAHOE                   40    23
5     REDIRECT EXAMINATION BY MR. WILSON:             76    5
   RUSTY COLON                                        81    1
6     DIRECT EXAMINATION BY MR. WILSON:               94    24
      CROSS-EXAMINATION BY MR. DONAHOE:               113   9
7     REDIRECT EXAMINATION BY MR. WILSON:             128   15
   ISRAEL TAYLOR                                      133   1
8     DIRECT EXAMINATION BY MR. DONAHOE:              133   5
      CROSS-EXAMINATION BY MR. WILSON:                134   22

9

10

11                    E X H I B I T   I N D E X

12         MARKED                                     PAGE LINE
      ------------------------------------------------------------
13  Exhibit 1                                         136   21

14

15

16

17

18

19

20

21

22

23

24

25

                        UNREDACTED TRANSCRIPT

1          JUNE 22, 2012

2

3          **THE COURT:**  Okay.  We are here this morning on

4     the matter of United States versus Frederick Cole.

5          **MR. DONAHOE:**  Can I get my client, Your Honor?

6     I'm sorry.

7          **THE COURT:**  He's being brought in as we speak.

8          **MR. DONAHOE:**  Thank you.

9          **THE COURT:**  All right.  This is

10     Number 11-10080.  We are here today for sentencing in

11     Mr. Cole's matter.  Counsel, before we get started, let's

12     review and be sure everybody has all the relevant

13     documentation.  According to what I'm showing, we have

14     the presentence report that was prepared on February

15     the 29th of 2012, and then there is a position statement

16     that was filed on behalf of Mr. Cole initially, Docket

17     Entry Number 12, filed on March the 27th; an amended

18     position paper filed on behalf of Mr. Cole, it's at

19     Docket Entry Number 16 filed on April the 25th of 2012.

20     Also the government had filed a position statement that's

21     found at Docket Entry Number 13.  And then an addendum to

22     the presentence report that is dated -- I don't see the

23     date on it.  But there is one -- I have one addendum to

24     the presentence report.

25          Mr. Wilson, is that everything you are aware

UNREDACTED TRANSCRIPT

1    of?

2              **MR. WILSON:**  Yes, Your Honor.

3              **THE COURT:**  Mr. Donahoe?

4              **MR. DONAHOE:**  Yes, sir.

5              **THE COURT:**  All right.  You haven't filed any

6    other position statements other than the two items

7    mentioned, have you?

8              **MR. DONAHOE:**  No, Your Honor.

9              **THE COURT:**  Okay.  All right.  Then I think we

10   are ready to proceed.  Let me establish first,

11   Mr. Wilson, did the government receive a copy of the

12   presentence report as well as the first addendum?

13             **MR. WILSON:**  I did, Your Honor.

14             **THE COURT:**  Mr. Donahoe, did you receive a

15   copy of the presentence report as well as the first

16   addendum?

17             **MR. DONAHOE:**  Yes, sir.

18             **THE COURT:**  Did you have an opportunity to

19   review both fully and completely with Mr. Cole?

20             **MR. DONAHOE:**  Yes, sir.

21             **THE COURT:**  Okay.  All right.  I guess,

22   Mr. Wilson, I'll start with you.  How much evidence are

23   we looking at on your behalf?

24             **MR. WILSON:**  I will have two -- I'm sorry --

25   three witnesses, Your Honor, as well as playing

UNREDACTED TRANSCRIPT

1    electronically eight recorded telephone calls.

2            **THE COURT:**  Okay.  Mr. Donahoe, what's your

3    best estimate?

4            **MR. DONAHOE:**  I just got one of the proffers

5    on one of the witnesses just about 30 seconds ago, so I

6    have at least two.

7            **THE COURT:**  At least two?

8            **MR. DONAHOE:**  Yes, sir.

9            **THE COURT:**  Okay.  All right.  Is there any

10   particular way you plan to present this, Mr. Wilson?

11   Obviously -- let me state for the record in the position

12   statements that Mr. Donahoe has filed, I think it would

13   probably be pretty accurate to say that Mr. Donahoe has

14   objected to a majority of the factual statements

15   contained in the report.

16           Would you agree with that, Mr. Donahoe?

17           **MR. DONAHOE:**  Yes, sir.

18           **THE COURT:**  So are you going to be presenting

19   this in any particular order, Mr. Wilson, or is it -- are

20   you going to deal with quantities first, deal with

21   particular factors first, or is it going to be just

22   depending on what the witness has knowledge of?

23           **MR. WILSON:**  Yes, Your Honor, I will be

24   roughly proceeding in the order of Mr. Donahoe and

25   Mr. Cole's objections.  I believe I've tried to track --

                    UNREDACTED TRANSCRIPT

1  go through Objection Number 1, present evidence to rebut

2  that, Objection Number 2, present evidence.

3              **THE COURT:**  Okay.  That will be helpful for

4  the court anyway to be able to maybe track it that way.

5              All right.  Are we ready to proceed, Counsel?

6        **MR. WILSON:**  Yes, Your Honor.

7              **THE COURT:**  Mr. Wilson, you can call your

8  first witness.

9              **MR. WILSON:**  I would call Task Force Officer

10  Rodney Weaver.

11             **THE COURT:**  Come up and be sworn, please.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*DIRECT - RODNEY WEAVER*                                        8

1                              **RODNEY WEAVER,**

2     having been first duly sworn, took the witness stand and

3     testified as follows:

                              DIRECT EXAMINATION

5     **BY MR. WILSON:**

6     *Q.*     Tell us your name, please.

7     *A.*     Rodney Weaver, W-E-A-V-E-R.

8     *Q.*     What is your profession?

9     *A.*     I'm a task force officer assigned to the Drug

10    Enforcement Administration.

11    *Q.*     How long have you been so employed?

12    *A.*     I've been assigned to the DEA for approximately

13    five years now.  I have a total of 20 years law

14    enforcement experience, 19 of those total in drug

15    enforcement.

16    *Q.*     Okay.  Prior to being with the DEA, you were the

17    special agent in charge of the 25th Judicial Drug Task

18    Force?

19    *A.*     That's correct.

20    *Q.*     Okay.  And is the majority of your law enforcement

21    experience in narcotics investigation?

22    *A.*     Yes.

23    *Q.*     And in the course of your 19 to 20 years of

24    narcotics investigation, have you investigated more than

25    a thousand drug cases?

                              UNREDACTED TRANSCRIPT

*DIRECT — RODNEY WEAVER*                                                         9

1    A.    Yes, sir.

2    Q.    Including that of marijuana?

3    A.    Yes, sir.

4    Q.    In the course of that experience, have you become

5    familiar with the methods that drug traffickers employ

6    when trafficking narcotics?

7    A.    Yes, sir.

8    Q.    In the course of your duties with DEA, did you

9    become familiar with Frederick Cole, the defendant here

10   today?

11   A.    I did, yes, sir.

12   Q.    Were you actively involved in the investigation

13   that involved him?

14   A.    Yes, sir.

15   Q.    Did that investigation lead to, I guess, the

16   indictment and ultimately what brought him here today?

17   A.    Yes, sir.

18   Q.    Did the investigation involve certain wiretaps or

19   wire communications that were intercepted pursuant to

20   court order?

21   A.    Yes, sir.

22   Q.    All right.  Have you reviewed various calls that

23   were intercepted pursuant to that wiretap order?

24   A.    Yes, sir, countless hours.

25   Q.    Was the wiretap on Mr. Cole's telephone?

UNREDACTED TRANSCRIPT

DIRECT — RODNEY WEAVER                                              10

1   A.    Not initially.  Initially he was intercepted in the

2   Stephen Cook part of the investigation that was initiated

3   out of the Memphis office, and I was involved with that

4   from the beginning.  Based on obtaining interceptions of

5   communications of Frederick Cole and Stephen Cook, a

6   wiretap was initiated on the telephones used by Frederick

7   Cole here in Jackson.

8   Q.    In preparation for today, have you and myself as

9   well as members of my office talked about certain

10  objections that the defendant has raised of activity

11  alleged in the presentence report?

12  A.    Yes, sir.

13  Q.    Okay.  Specifically, Mr. Cole has objected to

14  paragraph 6 of the presentence report, which contains

15  certain information, contains an objection that Mr. Cole

16  met Timothy Davis and got involved with Mr. Davis and

17  Mr. Cook, Stephen Cook as well as Stephen Elizondo and in

18  October of 2009 was involved in a shipment of 200 pounds

19  of marijuana.  Are you familiar with that activity he's

20  objected to?

21  A.    In which month?

22  Q.    October of 2009.

23  A.    I am familiar with that, yes, sir.

24  Q.    Did you have an opportunity in this case to

25  interview Stephen Cook?

UNREDACTED TRANSCRIPT

*DIRECT – RODNEY WEAVER*                                              11

1    *A.*    I did, yes, sir.

2    *Q.*    Did he mention a shipment of 200 pounds of

3    marijuana?

4    *A.*    Yes, sir.

5    *Q.*    What specifically did he mention regarding that

6    activity?

7    *A.*    That there was an amount of marijuana that was

8    distributed to Jesse Cook's residence.  There was some

9    discretion in the exact amount.  The amount was not less

10   than 200 pounds, but there was some discussion about the

11   weight being 500 pounds as well.  But the marijuana was

12   transported to Jesse Cook's house in Gadsden, Tennessee,

13   and then ultimately Frederick Cole obtained the

14   marijuana, and he was unable to pay for the entire

15   amount.  And he ended up returning approximately

16   90 pounds back to one of the Hispanic sources of supply.

17   *Q.*    That would be Carlos Valerio?

18   *A.*    Yes, sir.

19   *Q.*    And he returned the drugs back to Carlos Valerio

20   down in Mississippi?

21   *A.*    Well, it was brought back in this area to Carlos

22   Valerio and then was transported by Carlos Valerio down

23   to Mississippi, and this was prior to any interception of

24   communications.

25   *Q.*    Okay.  I believe you alluded to this, sir, but

UNREDACTED TRANSCRIPT

*DIRECT - RODNEY WEAVER*                                                    12

1   Jesse Cook was interviewed as well, was he not?

2   A.    Yes, sir, and he admitted it, and I believe he's

3   already pled to it.

4   Q.    Jesse Cook corroborated that this activity in the

5   200 -- well, the marijuana exchange took place?

6   A.    Yes, sir.

7   Q.    Did you have an opportunity to interview Carlos

8   Elizondo?

9   A.    Yes, he's better known as -- his real name is

10  Charles Elizondo, but he goes by Carlos.  Yes, we did

11  interview him.

12  Q.    What did he state regarding this shipment?

13  A.    That he described the marijuana being transported

14  to Jesse Cook's house, and he actually said it was

15  500 pounds.

16  Q.    So Carlos or Charles Elizondo as well as Jesse Cook

17  thought that the shipment might be 500 pounds but Stephen

18  Cook said it was 200 pounds?

19  A.    Yes.

20  Q.    Specifically Mr. Cole has also objected to

21  paragraph 7 of the presentence report, and that would be

22  a shipment of roughly 2,200 pounds of marijuana.  Are you

23  familiar with that activity?

24  A.    Yes, sir, it's 2,251.9 pounds.

25  Q.    All right.  Was there a call intercepted on the

                        UNREDACTED TRANSCRIPT

DIRECT – RODNEY WEAVER                                    13

1    wire pursuant to the order on the wire regarding this

2    shipment?

3    A.    Yes, sir, there was multiple calls concerning this

4    shipment by Frederick Cole and others in the conspiracy.

5    I might add that not only were interceptions --

6    authorization to intercept telephone communications

7    between Cook, on Cook's telephone that originally started

8    Fred Cole, there was also on Fred Cole authorization, and

9    then there was also a spinoff on to Charles Elizondo in

10   the McAllen, Texas office.  There was authorization to

11   intercept communications of his telephone, and Frederick

12   Cole was also intercepted discussing with Charles

13   Elizondo in that interception as well.

14   Q.    In preparation today, what you and I referred to as

15   recorded call number 1, does that call contain the voice

16   of the defendant?

17   A.    I believe so, yes, sir.

18   Q.    And you've listened to call number 1, and you've

19   spoken with Mr. Cole, and is it his voice?

20   A.    Yes, sir.

21            (An audio recording was played).

22            **MR. WILSON:**  For the court's information, I

23   will provide each recording to the court reporter, or if

24   the court would like me to introduce them as exhibits, I

25   know it's very hard for the court reporter to follow this

UNREDACTED TRANSCRIPT

*DIRECT – RODNEY WEAVER*                                          14

1    fast talking on the recording.

2              **THE COURT:**  I would say probably impossible.

3    I don't guess you have transcripts?

4              **MR. WILSON:**  I don't, Your Honor.

5              **THE COURT:**  All right.  The CDs can be

6    introduced into evidence.

7              **MR. WILSON:**  Yes, sir.

8              **THE COURT:**  But I may need to listen to them

9    once again to try to sort through some of this, but there

10   is no way the court reporter can get that down, I don't

11   think.

12             **MR. WILSON:**  Yes, sir.

13             **THE COURT:**  All right.  Go ahead.

14   **BY MR. WILSON:**

15   *Q.*    Officer Weaver, there were –– first off, who was

16   Frederick Cole talking to on that call?

17   *A.*    That person was never identified.

18   *Q.*    There was some reference to McAllen and the truck

19   and getting stopped and I believe a checkpoint.  Are you

20   familiar with what you believe they are talking about?

21   *A.*    Yes, sir, I believe ––

22             **MR. DONAHOE:**  Objection.  This is his

23   speculation about what he believes the state of mind of

24   this person and the person he was talking to was, Your

25   Honor.  The statements on the tape stand for themselves,

                    UNREDACTED TRANSCRIPT

*DIRECT – RODNEY WEAVER*                                                    15

1    but an interpretation by somebody else about what they

2    were talking about with no clear identifier is just

3    wrong.

4                **THE COURT:**  Mr. Wilson?

5                **MR. WILSON:**  I can lay some foundation, Your

6    Honor, and --

7                **THE COURT:**  Let's do that.  Let him see if you

8    can lay a foundation, and you can renew your objection if

9    you would like to.

10   **BY MR. WILSON:**

11   *Q.*    Sir, this call took place roughly June of 2010?

12   *A.*    Yes, sir.

13   *Q.*    Did you become familiar with a truck that was

14   intercepted down in McAllen back in February of 2010?

15   *A.*    Yes, sir.

16   *Q.*    Who was that truck driven by?

17   *A.*    Timothy Davis.

18   *Q.*    Okay.  Did he have a nickname?

19   *A.*    Cheeseburger.

20   *Q.*    And where was that truck and Mr. Davis stopped?

21   *A.*    At Falfurrias, Texas, at the border patrol

22   checkpoint.

23   *Q.*    And do you have any information on Mr. Cole's

24   whereabouts at that same time?

25   *A.*    Yes, sir, he was at Falfurrias, Texas, at the

                        UNREDACTED TRANSCRIPT

 1  checkpoint also checked by border patrol.

 2  *Q.*    How do you know that?

 3  *A.*    Based on the investigation and proffer statements

 4  as well as other people.

 5  *Q.*    Okay.  What ultimately was found in that truck?

 6  *A.*    2,251.9 pounds.

 7  *Q.*    Did you receive or review any evidence that linked

 8  that marijuana to Mr. Cole?

 9  *A.*    Yes, sir, based on statements obtained by

10  individuals that are cooperating as well as a post arrest

11  statement provided by Frederick Cole at the time of his

12  arrest admitting that he was obtaining a portion of that

13  marijuana.

14          **THE COURT:**  All right.  You want to renew your

15  objection, Mr. Donahoe?

16          **MR. DONAHOE:**  The question as it was asked, I

17  mean the testimony so far −− I realize, I realize this is

18  a sentencing hearing, Your Honor, and there is some

19  leeway, especially with regard to some hearsay

20  statements, but so far the testimony is fine, but,

21  however, to ask him his interpretation of what the

22  discussion was about when the issue is Mr. Cole's −− did

23  he set up that deal or was he involved in that deal,

24  there is no −− there is no proof yet that that's the

25  case.

UNREDACTED TRANSCRIPT

1            THE COURT:  Well, he apparently gave a

2     statement.

3            MR. DONAHOE:  They have not introduced the

4     statement, not shown the statement, not introduced the --

5            THE COURT:  At this point, there is an indicia

6     of reliability as far as what the witness is testifying

7     to, so I'll overrule the objection.  Go ahead.

8            MR. DONAHOE:  Thank you.

9     BY MR. WILSON:

10    Q.    Officer Weaver, do you believe through your

11    investigation in reviewing this recording that Mr. Cole

12    is talking about that shipment that was intercepted back

13    in February of 2010?

14            MR. DONAHOE:  Again, I'm sorry, Your Honor,

15    but that's a different question, and it's phrased

16    differently, asking this officer his opinion about the

17    state of mind of the defendant, which is improper.

18            THE COURT:  All right.  Reask your question,

19    Mr. Wilson.

20    BY MR. WILSON:

21    Q.    Is it your opinion, sir, that Mr. Cole is speaking

22    about the February of 2010 shipment that was intercepted

23    on this phone call?

24            MR. DONAHOE:  Same objection.  The

25    documents -- I'm sorry -- the recording stands in and of

                    UNREDACTED TRANSCRIPT

*DIRECT – RODNEY WEAVER*                                              18

1   itself.  The interpretation of the recording about what

2   my client's state of mind is is inappropriate.

3            **THE COURT:**  Overruled.  I think the court can

4   take into consideration whatever the witness's opinion is

5   and weigh that in relationship to the overall testimony

6   that's offered during the hearing.  Go ahead.

7            **MR. WILSON:**  Same question, sir.

8            **THE WITNESS:**  Yes, sir.

9   **BY MR. WILSON:**

10  *Q.*   I believe you stated that Stephen Cook also gave

11  information regarding this intercepted shipment?

12  *A.*   Yes, sir.

13  *Q.*   What specifically did Mr. Cook give regarding the

14  shipment and Mr. Cole's involvement?

15  *A.*   He stated that Frederick Cole knew exactly how much

16  marijuana was on the truck that day and that Stephen Cook

17  provided information that at least 150 pounds of

18  marijuana was coming to Jackson, Tennessee for Fred to

19  distribute and even provided negotiated pricing of the

20  marijuana.

21  *Q.*   Do you have -- I believe you have implied the

22  answer to this question, but did you receive the

23  information that the defendant was down in the general

24  area of Texas during this time?

25  *A.*   Yes, sir.

*DIRECT - RODNEY WEAVER*                                              19

1    *Q.*    You received information that the defendant

2    traveled down to Houston and later went to a ranch; is

3    that right?

4    *A.*    Yes, sir, at some point, but based on that, I do

5    believe that that particularly could have been a

6    reference to another load of a thousand pounds or more

7    that was transported to Atlanta by Timothy Davis.

8    *Q.*    So there were other loads in the course of this

9    investigation?

10    *A.*    Yes, sir.

11    *Q.*    Did Elizondo confirm that this -- that the

12    defendant was involved in this 2200-pound load?

13    *A.*    Yes, sir, according to Elizondo, he said that his

14    intentions were that all of the marijuana was going to go

15    to Fred.

16    *Q.*    What did Timothy Davis say regarding this load?

17    *A.*    He said that Cole was down there, he didn't know --

18    he didn't personally notice or observe any transactions

19    or negotiations by Fred Cole in this particular load but

20    confirmed that he was there, and he got stopped at the

21    checkpoint as well.  But during that trip, Cole

22    confronted Timothy Davis and asked him about transporting

23    a kilo.

24    *Q.*    A kilo of what?

25    *A.*    It was not discussed as to what type of controlled

*DIRECT − RODNEY WEAVER*                                                          20

1    substance.  He just discussed the quantity.

2    *Q.*    Did Timothy Davis state that he was already aware

3    that there was marijuana on the truck?

4    *A.*    He didn't know how much, but he knew it was there.

5    *Q.*    Okay.  But this kilo was apparently some other

6    substance?

7    *A.*    Yes.

8            **MR. DONAHOE:**  Objection.  There is no proof of

9    that.  There is no proof anywhere.  The officer testified

10   that he didn't know what it was, he didn't know what was

11   being discussed, and to imply otherwise is strict

12   speculation.

13           **MR. WILSON:**  Your Honor, I can withdraw that.

14   Mr. Davis is going to testify shortly.

15           **THE COURT:**  All right.  That's sustained.

16   **BY MR. WILSON:**

17   *Q.*    Specifically, Officer Weaver, the defendant has

18   objected to paragraph 8 of the presentence report which

19   apparently involved some activity regarding 80 pounds of

20   marijuana back in April of 2010 and a meeting between the

21   defendant and Vincent Berry off Interstate 40?

22   *A.*    Yes, sir.

23   *Q.*    Did you receive any information and are you

24   familiar with any of the defendant's involvement in that

25   activity?

UNREDACTED TRANSCRIPT

*DIRECT − RODNEY WEAVER*                                                          21

1  A.    Yes, sir, based at that time off the interception

2  of the communication of Stephen Cook's wire, we

3  determined than Vincent Berry was transporting a load of

4  marijuana from McAllen, Texas to Dallas, ultimately to

5  Jackson.  As a result of the interceptions, we

6  established surveillance at the TA Truck Stop at Exit 68

7  where we identified Frederick Cole who arrived in a

8  rental vehicle, met with Berry, had conversations with

9  Stephen Cook regarding the transportation.

10          **MR. DONAHOE:**  Your Honor, in the interest of

11  time, we made a mistake.  Paragraph 8, we don't object to

12  that.  We are involved in that 80−pound shipment.

13          **THE COURT:**  You don't object to that?

14          **MR. DONAHOE:**  We withdraw that.

15          **THE COURT:**  Mr. Wilson, you can move on then.

16  **BY MR. WILSON:**

17  Q.    Specifically, Officer Weaver, the defendant has

18  objected to paragraph 9 of the presentence report

19  involving the shipment of some cocaine via commercial

20  bus?

21  A.    Yes, sir.

22  Q.    Did you intercept a call that you believe related

23  to that?

24  A.    Yes, sir.

25          (An audio recording was played).

UNREDACTED TRANSCRIPT

1          **MR. WILSON:**  For some reason I can't

2    understand the second part of that.

3    **BY MR. WILSON:**

4    *Q.*    Did you review a call from April of 2010 where the

5    defendant was speaking with Stephen Cook?

6    *A.*    Yes, sir, I believe it was on April the 23rd.

7    *Q.*    Did he ask Stephen Cook about that other T-shirt,

8    no or yes?

9    *A.*    Yes, sir.

10    *Q.*    Did Cook respond he doesn't know yet?

11    *A.*    Yes, sir.

12    *Q.*    Okay.  Do drug traffickers sometimes use coded

13    language to refer to their narcotics?

14    *A.*    They do, yes, sir.

15    *Q.*    Do you believe there was code being used here?

16    *A.*    Yes, sir.

17          **MR. DONAHOE:**  Objection.  There is no

18    foundation for that.  No foundation they used a code, no

19    foundation that this is the code they used.  There is no

20    proof whatsoever.

21          **THE COURT:**  You probably need to see if you

22    can lay a little more foundation, Mr. Wilson.

23          **MR. WILSON:**  Okay.

24    **BY MR. WILSON:**

25    *Q.*    What led you, sir -- I'm assuming you didn't think

UNREDACTED TRANSCRIPT

DIRECT – RODNEY WEAVER                                            23

1   that the defendant was talking about T-shirts?

2            **MR. DONAHOE:**  Objection to the continued

3   leading.

4            **THE COURT:**  Overruled.  Go ahead.

5   **BY MR. WILSON:**

6   Q.    Did you believe he was talking about T-shirts?

7   A.    No, sir.

8   Q.    Why not?

9   A.    There was one particular –– there was another

10  particular call where they were discussing prices of what

11  was consistent with a kilogram, and the number 30 was

12  mentioned.  I do recall that.

13  Q.    30, what's the –– is $30 the price of a kilogram of

14  cocaine?

15  A.    30,000.

16  Q.    Is that consistent with the price of a kilo of

17  cocaine around West Tennessee?

18  A.    Yes, sir.

19  Q.    Based upon that conversation, was the defendant

20  referring to that as T-shirts?

21  A.    I believe so, yes, sir.  It's my understanding.

22            **MR. DONAHOE:**  Once again, Your Honor, he's

23  guessing.  That's all.

24            **THE COURT:**  I note your objection.

25  **BY MR. WILSON:**

UNREDACTED TRANSCRIPT

*DIRECT – RODNEY WEAVER*                                              24

1    Q.    Was there also a call, a second call recorded on

2    April the 23rd, 2010, where the defendant spoke with

3    Stephen Cook about $36,000 of cocaine from Atlanta?

4    A.    Yes, sir, that may be the one that I was thinking

5    of earlier.

6              (An audio recording was played).

7    **BY MR. WILSON:**

8    Q.    Officer Weaver, did you hear the phrase or the term

9    "J" in that recording?

10   A.    Yes, sir.

11   Q.    In your training and experience, what does "J" have

12   of significance to you?

13   A.    In my opinion, I think that in that particular

14   conversation, that they are talking about, if I heard it

15   right, Jackson, bringing it to Jackson.

16   Q.    1200 to J?

17   A.    1200 to J would be a reference to an amount of

18   cocaine, a juice.

19   Q.    What's a juice in your experience as drug code?

20   A.    For 1 ounce of cocaine.

21   Q.    Do you ever hear J, marijuana referred to J?

22   A.    No, sir.

23   Q.    Is it unique in your training and experience with

24   hard drugs like cocaine, crack cocaine?

25   A.    Yes, sir.

UNREDACTED TRANSCRIPT

*DIRECT - RODNEY WEAVER*                                                  25

1   *Q.*    Did you overhear from the recording where one of

2   the individuals said, 98 percent pure, you can make two?

3   *A.*    Yes, sir.

4   *Q.*    All right.  In your training and experience, is

5   cocaine sometimes cut or mixed with adulterants to I

6   guess increase the quantity?

7   *A.*    Yes, sir, and also cuts the purity.

8   *Q.*    Did you speak with Stephen Cook regarding the

9   defendant's involvement in a shipment of an amount of

10  cocaine?

11  *A.*    Yes, sir, on two occasions.

12  *Q.*    What did he tell you?

13  *A.*    That on one occasion he said that Elizondo had

14  arranged 5 kilos of cocaine to be shipped to Dallas by

15  bus, by females that were strapped to their body, and

16  that Cook, Stephen Cook obtained one of those kilos and

17  provided Fred Cole a half of a kilo for a female to carry

18  back to Jackson on the bus.  And then on the second

19  occasion, Cook reaffirmed that sometime in April of 2010,

20  that two females transported cocaine to Dallas by bus and

21  then that Cole traveled to Dallas and arranged for a

22  female to transport the kilo from Dallas back to West

23  Tennessee.

24          **MR. DONAHOE:**  Your Honor, we ask the court to

25  recognize that the record reflect that the officer is

UNREDACTED TRANSCRIPT

DIRECT - RODNEY WEAVER                                    26

1    referring to notes that he has with him on the stand as

2    he testifies.  I'm going to be asking for those when he

3    completes his testimony.

4              **THE COURT:**  All right.  So noted.

5    **BY MR. WILSON:**

6    Q.    What you just testified about, sir, that based upon

7    that, you believe the defendant was involved in a

8    shipment of a half kilogram of cocaine?

9    A.    Yes, sir.

10    Q.    And this call the court -- we all heard was

11    April 23rd of 2010?

12    A.    Yes, sir.

13    Q.    All right.  The defendant has objected to paragraph

14    number 10 objecting specifically to the defendant

15    receiving 90 pounds of marijuana involving a shipment to

16    St. Louis in May of 2010.

17              **MR. DONAHOE:**  Your Honor, in the interest of

18    time, paragraph 10, the 90-pound shipment is not objected

19    to by the defendant.

20              **THE COURT:**  All right.

21    **BY MR. WILSON:**

22    Q.    Did you intercept, sir, a call from June 21st,

23    2010, where the defendant directs his wife or girlfriend

24    Angela Bass to meet an individual named Big Cheese?

25    A.    I remember the incident, not totally certain about

UNREDACTED TRANSCRIPT

*DIRECT – RODNEY WEAVER*                                                    27

1    the date.

2    *Q.*    Okay.  And meeting at a Kroger by The Movie Gallery

3    and a payment of apparently $8,000?

4    *A.*    Yes, sir, that was the sum of money discussed.

5             **MR. DONAHOE:**  Your Honor, again, paragraph 12,

6    the 10 pounds involved there we do not object to.

7             **THE COURT:**  Okay.

8    **BY MR. WILSON:**

9    *Q.*    Sir, paragraph 13, the defendant has objected to an

10   apparent 270 pounds of marijuana received at a checkpoint

11   in Falfurrias, Texas, August 1 of 2010.  What information

12   did you receive regarding the defendant's involvement in

13   that?

14   *A.*    Yes, sir, that Stephen Cook stated in a proffer

15   that the load was being delivered to Fred Cole to be

16   distributed.  Also Elizondo admitted that the load of

17   marijuana was being transported to Jackson for

18   distribution and that Frederick Cole was responsible for

19   distributing marijuana for both Cook and Elizondo.

20   *Q.*    This marijuana was being transported by an

21   individual named Terrence Brooks?

22   *A.*    Yes, sir.

23   *Q.*    What did Brooks advise in his post arrest

24   statement?

25   *A.*    He said in a post arrest statement that he was

                        UNREDACTED TRANSCRIPT

*DIRECT — RODNEY WEAVER*                                                     28

1    instructed by Cook to drive the load to Tennessee.

2    After –– there was a meeting that took place between

3    Frederick Cole and Stephen Cook at Buffalo Wild Wings,

4    and Terrence Brooks around June the 15th, I believe,

5    which would have been prior to this seizure, but also

6    Terrence Brooks was arrested with another load in Texas

7    and was charged in state court that reflected it was more

8    than 50 pounds.  According to both Terrence Brooks and

9    Stephen Cook, that on the June 15th of 2010 meeting, that

10   they provided proof to Frederick Cole that a load of

11   marijuana had been seized from Terrence Brooks.  Based on

12   the time that the meeting took place and the time of this

13   seizure, I believe that that was in reference to the

14   first load that was taken from Terrence Brooks.

15   *Q.*    The 271 pounds?

16        **MR. DONAHOE:**  Again, Your Honor, we are back

17   to the officer, without any contrary evidence of any

18   kind, I believe this referred to that and that referred

19   to this, with no connection whatsoever.

20        **THE COURT:**  Mr. Donahoe, the witness has

21   testified that he's been involved in this investigation

22   since apparently the beginning and that he has been

23   involved in a number of drug investigations, has

24   experience in that regard, has knowledge of the drug

25   world and transactions and how they occur, so I think he

*DIRECT – RODNEY WEAVER*                                              29

1    can offer his opinion as to what the tapes refer to.

2              Now whether the court accepts that completely

3    or not is up to the court, but I think he can give his

4    opinion.  I think there is a sufficient reliability there

5    for him to be able to give his opinion, and it's up to

6    the court to weigh that and determine how much weight it

7    should be given.

8              **MR. DONAHOE:**  I understand, Your Honor.

9              **THE COURT:**  All right.

10             **MR. DONAHOE:**  I understand the court's ruling,

11   and I mean no --

12             **THE COURT:**  I understand.  I tell you what, we

13   will say you have a continuing objection.

14             **MR. DONAHOE:**  Thank you, Your Honor.

15             **THE COURT:**  All right.  Go ahead.

16   **BY MR. WILSON:**

17   *Q.*    Sir, the defendants object to paragraph 14, which

18   talks about a 120-pound shipment of marijuana that was

19   seized on September 24th of 2010, apparently some

20   methamphetamine, too.  Are you familiar with that?

21   *A.*    Yes, sir.

22   *Q.*    Okay.

23   *A.*    That load is actually I think approximately

24   300 pounds of marijuana total, but according to Stephen

25   Cook, Frederick Cole was getting 120 pounds of that

                    UNREDACTED TRANSCRIPT

1  shipment.

2  Q.   Okay.  What was an individual named Mark Cherry's

3  involvement in that?

4  A.   He was a truck driver that was tasked with driving

5  a commercial vehicle to McAllen, Texas, and he ultimately

6  obtained a shipment of marijuana and methamphetamine that

7  was ultimately seized at the Falfurrias checkpoint in

8  Falfurrias, Texas.

9  Q.   Was Mr. Cherry interviewed?

10  A.   Yes, sir.

11  Q.   What did he state regarding --

12  A.   He said that he was instructed to drive the load of

13  marijuana to Jackson, Tennessee, and he was not totally

14  familiar with Frederick Cole.  He only knew of him as

15  Little Fred and that he was responsible for the

16  distribution of the marijuana for Stephen Cook.

17  Q.   An individual named Little Fred?

18  A.   Yes, sir, he did not personally know him, though.

19  Q.   All right.  The defendant has objected to

20  paragraph 16 regarding firearms and apparent connection

21  of the firearms to drug trafficking activity.  Are you

22  familiar with any firearms in this case?

23  A.   Yes, sir, there was two seized at Frederick Cole's

24  residence the morning of his arrest and search warrant.

25  He admitted to possessing those firearms during a post

UNREDACTED TRANSCRIPT

DIRECT - RODNEY WEAVER                                                    31

1    arrest statement.  There were also, during the course of

2    this investigation, interception of communications where

3    Frederick Cole was bragging about using a firearm in

4    certain situations during -- getting his point across I

5    guess would be a way to say it.

6    Q.    Let's talk about the search warrant.  That was

7    January 12th, 2011?

8    A.    Yes, sir.

9    Q.    94 Spindrift Drive, the apparent residence of

10   Frederick Cole and Angela Bass?

11   A.    Yes, sir.

12   Q.    Was there a Ruger .45 caliber pistol found loaded

13   in the master bedroom of the home?

14   A.    I know there was two pistols.  I would have to look

15   at the report to reflect the exact time and caliber, but

16   there were two pistols found in the bedroom.

17   Q.    Was there also electronic scales, a pipe and

18   apparent drug documents found in the search warrant?

19   A.    I believe that's my understanding, yes, sir.  I

20   would have to refer back to the actual report to confirm

21   exactly what was found.

22   Q.    All right.  But you are aware of two pistols being

23   found?

24   A.    Yes, sir, I'm aware of that.

25   Q.    What did Angela bass saying regarding those

                         UNREDACTED TRANSCRIPT

*DIRECT — RODNEY WEAVER*                                                    32

1    pistols?

2    *A.*    I don't remember.

3    *Q.*    Do you recall her stating that --

4              **MR. DONAHOE:**  Objection.

5              **THE COURT:**  Sustained.  Do you have something

6    you want to refresh his memory with, Mr. Wilson, that

7    might be different, but you can't lead it that way.

8              **MR. WILSON:**  Yes, Your Honor.

9              **THE WITNESS:**  I do specifically remember Fred

10   Cole claiming the two pistols.

11             **THE COURT:**  I'm sorry.  What did you just say?

12             **THE WITNESS:**  I do remember Frederick Cole in

13   his post arrest statement claiming the two pistols as

14   being his and that he had them for protection.

15             **THE COURT:**  All right.  Go ahead.

16   **BY MR. WILSON:**

17   *Q.*    Did you receive any information that the defendant

18   had been robbed of drugs in the past?

19   *A.*    Yes, sir.

20   *Q.*    And Mr. Cole stated that he had the pistols for

21   protection?

22   *A.*    Yes, sir.

23   *Q.*    All right.  And you stated there was a phone call

24   where Mr. Cole was advising Stephen Cook that he had

25   specific firearms, an AK?

                        UNREDACTED TRANSCRIPT

*DIRECT – RODNEY WEAVER*                                                          33

1    *A.*    Yes, sir.

2    *Q.*    And this was during a pertinent or what you

3    believed to be a drug-related call?

4    *A.*    Yes, sir.

5              **MR. WILSON:**  Please play Number 6.

6              (An audio recording was played).

7              **MR. WILSON:**  Your Honor, for the court's

8    information this entire call will be introduced into

9    evidence, however, it is 34 minutes long.  The pertinent

10   part that the government intends to rely on is very

11   short, so for everyone's knowledge, I intend to skip

12   forward to that part.

13             **THE COURT:**  Any objection, Mr. Donahoe?

14             **MR. DONAHOE:**  No, Your Honor.

15             **THE COURT:**  Go ahead, Mr. Wilson.

16             **MR. DONAHOE:**  As long as we can identify who

17   is -- once we get to where we are going, who's talking

18   and who's not because it changes.  I want to know who's

19   talking, where we are, what time and what location.

20             **THE COURT:**  Let's get to the part that's

21   relevant and, Mr. Wilson, you can ask the witness

22   whatever questions you need to to try to establish who is

23   speaking or what other information might be important for

24   the court to know.

25             **MR. WILSON:**  Yes, sir.

                        UNREDACTED TRANSCRIPT

*DIRECT – RODNEY WEAVER*                                                    34

1          (An audio recording was played).

2     **BY MR. WILSON:**

3     Q.    Officer Weaver, you've reviewed that recording and

4     while I didn't specifically hear it, you state that

5     Mr. Cole said something about an AK?

6     A.    I know there is some particular calls, and I would

7     have to listen to the call, but he clearly talked about

8     shooting someone.

9     Q.    Just for the record, Mr. Cole is the deeper,

10    seemingly closer voice on the recording?

11    A.    The louder, and the other one is Timothy Davis.

12    The initial was a female that I do not know who that is.

13    I don't believe we ever identified her.  And that was an

14    incoming call that he clicked over on and was talking to

15    Timothy Davis.

16    Q.    Yes, sir.  Specifically Mr. Cole has objected to

17    paragraph number 17 regarding some money being wired by

18    Angela Bass.  Are you familiar with that activity?

19    A.    Yes, sir.

20    Q.    Okay.  And what did the defendant himself say about

21    wiring the money?

22    A.    That all the money that was wired was from the sale

23    of controlled substances.

24    Q.    Did he state that all the money wired to Billy

25    Dowell, Charles Elizondo and Stephen Cook was payment for

                    UNREDACTED TRANSCRIPT

1    marijuana?

2    A.    In part, and then sometime later on he backed up

3    and said that all the money that went to Billy Dowell was

4    not marijuana or not for controlled substances, it was

5    for music promotion.  But originally he admitted that all

6    the money that been electronically transferred was for

7    controlled substance payment.

8    Q.    Do you recall what Ms. Bass said about wiring money

9    and the defendant's involvement in that?

10    A.    That she did exactly what Fred told her to do.

11    Q.    That Frederick Cole had directed her to wire the

12    money?

13    A.    Yes.

14    Q.    Sir, Mr. Cole has objected to paragraph number 18,

15    which talks about his relationship with an individual

16    named Kelsey Robinson?

17    A.    Yes, sir.

18    Q.    What was Mr. Robinson's nickname?

19    A.    Cheese.

20    Q.    And what did Mr. Robinson state regarding Mr. Cole

21    and marijuana?

22    A.    One more thing.  He was also called Big Cheese, Big

23    Cheese or Cheese.  That he would obtain marijuana from

24    Frederick Cole in order for him to sell and that he also

25    aided and worked with, at Fred Cole's direction, in the

*DIRECT - RODNEY WEAVER*                                                36

1   distribution of marijuana.

2   Q.    Okay.  Was Mr. Robinson intercepted on any of these

3   wire recordings?

4   A.    Yes, sir.

5   Q.    And did he discuss drug trafficking with the

6   defendant?

7   A.    Yes, sir, and not only -- yes, to include payments

8   and money.

9   Q.    On numerous occasions?

10  A.    Yes, sir.

11  Q.    What did Mr. Robinson state as far as amounts he

12  would obtain from Frederick Cole?

13  A.    Well, I know that on one particular occasion he

14  obtained approximately 10 pounds.  I know on one occasion

15  that he obtained an amount of money from Angela Bass at

16  Fred Cole's direction to travel to Houston to purchase

17  marijuana from an individual in Houston.  That money was

18  ultimately seized on the interstate.  He also went to

19  Mississippi with Fred on one occasion, met with Richard

20  Delarosa and said they picked up two bags of marijuana,

21  and he knew that one bag weighed 30 or 40 pounds.

22  Q.    The defendant has objected to paragraph 19, which

23  talks about roughly a 60-pound shipment of marijuana in

24  Mississippi.  I believe you started to go into that, but

25  what did Mr. Cole himself say about that trip?

UNREDACTED TRANSCRIPT

1    A.    I will have to refer back to his statement to

2    refresh my memory exactly on that.  But there was Kelsey

3    Robinson confirmed and also Richard Delarosa, who

4    actually provided the marijuana, and he admitted that it

5    was 90 pounds.

6    Q.    Do you have the defendant's statement?

7    A.    I do not.

8    Q.    But you're saying Kelsey Robinson as well as

9    Richard Delarosa confirmed this trip to Mississippi with

10   the two bags in place?

11   A.    Yes, sir, and Kelsey Robinson's statement was just

12   immediately after his arrest, which was against his own

13   best interest.

14   Q.    The defendant has objected to paragraph 20 about

15   supplying marijuana to Andre Walker.  Was Mr. Walker

16   interviewed?

17   A.    He was.  Just giving a rough statement, he admitted

18   to purchasing marijuana from Frederick Cole, and my

19   calculations, based on the amount that he admitted to,

20   was about 240 pounds.

21   Q.    Did he admit to purchasing from Mr. Cole as far

22   back to 2005?

23   A.    Yes, sir, and that was not all at one time, the

24   240 pounds.  That was over a period of approximately five

25   years maybe.

UNREDACTED TRANSCRIPT

*DIRECT – RODNEY WEAVER*                                                    38

1    Q.    Defendant has objected to paragraph 21, again,

2    referring to wire transfers to Billy Dowell.  Did you

3    speak and review documents obtained by Special Agent Brad

4    Livingston with the IRS?

5    A.    Yes, sir.

6    Q.    And from your review of those documents, do you

7    agree with the figure of $28,000 wired to Billy Dowell?

8    A.    I would say that would be an accurate reflection,

9    yes, sir.  I knew there were several.

10   Q.    There was marijuana obtained from California by

11   Mr. Cole during the course of this investigation; is that

12   right?

13   A.    There was marijuana sent from California to

14   Frederick Cole, but we intercepted that package through

15   UPS.  It was 22, roughly 22 pounds.

16   Q.    What was –– do you agree with the figure of roughly

17   $800 per pound for that marijuana?

18   A.    Yes, sir, and if I remember correctly, I think that

19   Mr. Cole admitted that that's what he was paying in the

20   end for that amount because of the grade.

21   Q.    There is different prices attributed, I guess,

22   based on the quality or the grade of marijuana?

23   A.    Yes, sir.

24   Q.    During the course of your investigation, your

25   review of the intercepted calls, did you hear the

UNREDACTED TRANSCRIPT

1  defendant directing others in his drug trafficking

2  activity?

3  *A.*    I did, yes, sir.

4  *Q.*    Give us some examples.

5  *A.*    Kelsey Robinson, Angela Bass, Andre Walker, Richard

6  Delarosa, some unindicted individuals, Ida Williams,

7  Laquita McCrory, William Bumpus, and even his own momma.

8  *Q.*    Did the drug trafficking organization involve more

9  than five people?

10  *A.*    Yes, sir.

11  *Q.*    And I'm assuming from your previous answer that the

12  defendant directed at least one of those individuals?

13  *A.*    Yes, sir.

14  *Q.*    Did you review a call where Mr. Cole directs Angela

15  Bass and gets angry with her about shrink wrapping some

16  money?

17  *A.*    Yes, sir.

18  *Q.*    And this call was made June of 2010; is that right?

19  *A.*    I believe so, yeah.  I would have to look at the

20  exact date on the --

21          (An audio recording was played).

22  **BY MR. WILSON:**

23  *Q.*    Do you recall an interception of the defendant

24  where he talks about directing other individuals to wire

25  money, specifically females?

UNREDACTED TRANSCRIPT

*DIRECT - RODNEY WEAVER*                                                    40

1    A.    Yes, sir, I remember that on some occasions he

2    talked about having people lined up to do that,

3    especially when he's talking to Carlos Elizondo.

4    Q.    Okay.  I believe we've heard recordings here in

5    court, but did you hear the defendant refer to "my

6    people"?

7    A.    Yes, sir, in first person.

8    Q.    And from your review of that, you believe that's a

9    drug reference to other individuals involved in this drug

10   trafficking organization?

11   A.    Yes, sir.

12   Q.    In a call we heard about Angela Bass; were there

13   other calls where he directed her to do activity such as

14   retrieve money on his behalf?

15   A.    Yes, sir, retrieve and send money.

16            **MR. WILSON:**  Yes, sir.

17            Your Honor, that's all the questions I have

18   for Officer Weaver at this point.

19            **THE COURT:**  All right.  Mr. Donahoe?

20            **MR. DONAHOE:**  Thank you, Your Honor.  May I

21   have just a moment?

                          CROSS-EXAMINATION

23            **MR. DONAHOE:**  I noted earlier that the officer

24   had referred to, to help refresh his memory, notes that

25   he had with him.  I would ask to be able to review those,

                          UNREDACTED TRANSCRIPT

1    please.

2              **THE COURT:**  All right.  Mr. Wilson?

3              **MR. WILSON:**  No objection.

4              **THE COURT:**  If you would pass your notes up to

5    Mr. Donahoe.

6              **MR. DONAHOE:**  It's going to take just a

7    minute, Your Honor.

8              **THE COURT:**  Go ahead.

9              **MR. DONAHOE:**  I'm finished with these, Your

10   Honor.

11             **THE COURT:**  All right.  Go ahead.

12             **MR. DONAHOE:**  Your Honor, one other item.  I

13   was given the proffered testimony -- I'm sorry.  I was

14   given a proffer by Timothy Davis.  The agent has

15   referenced Timothy Davis during his testimony here.  I

16   have not previously seen this.  It was handed to me today

17   just prior to beginning at the time.  I need to be able

18   to look at that also.  I'm sorry.

19             **THE COURT:**  All right.  How much time do you

20   think you are going to need?

21             **MR. DONAHOE:**  It is two separate statements,

22   two different days, one of seven pages, one of eight.

23             **THE COURT:**  Is it something you could go on

24   and question the witness about until we break for lunch

25   and then look at it over the lunch hour?

                          UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                                    42

1          **MR. DONAHOE:**  Whatever Your Honor pleases.

2    I'll be happy to follow any direction.

3          **THE COURT:**  If you can do that, let's proceed

4    and question him as much as you can, and whenever you

5    need a break to review that, we will take a break.

6          **MR. DONAHOE:**  Yes, sir.

7    **BY MR. DONAHOE:**

8    *Q.*    Agent Weaver, the primary people involved in this

9    conspiracy, I say primary, I mean people who were

10   responsible for obtaining all the marijuana or any other

11   drug that was involved were Elizondo, he was one of them?

12   *A.*    He was one, yes, sir.

13   *Q.*    Elizondo and then Cook, Stephen Cook?

14   *A.*    He was involved, yes, sir.

15   *Q.*    But Elizondo was responsible -- all the marijuana

16   that we are talking about here today all came through

17   Elizondo?

18   *A.*    Not all of it.

19   *Q.*    All of it except for a small portion?

20   *A.*    There was a percentage.  Richard Delarosa was

21   involved as well.  Richard and Elizondo were kind of

22   connected, too, so --

23   *Q.*    Delarosa -- any time marijuana was shipped,

24   Elizondo set up the shipment even if it was Delarosa's

25   dope and if it was --

                    UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                          43

1    A.    No, sir, not my understanding, no.

2    Q.    So you are telling me that's not the case, that

3    there was other shipments set up by other people?

4    A.    Particularly the ones in Mississippi, yes, sir,

5    that went -- they picked up in Mississippi.  I don't

6    believe Elizondo had anything to do with that.

7    Q.    Who was driving that truck?

8    A.    It was where Kelsey Robinson and Fred went down and

9    met with -- a female went with them and they picked up

10   the marijuana in Mississippi and brought it back to

11   Jackson.

12   Q.    And we know about that from Robinson, that shipment

13   was not intercepted?

14   A.    Seized, no.

15   Q.    So the only way we know about that is from

16   statement Kelsey Robinson made?

17   A.    No, I recall there was an intercepted call

18   regarding going to Mississippi and a female driving it

19   back, but I don't have that with me, but there was -- I

20   do recall a referenced call in that.

21   Q.    The large shipments involving the trucks -- and by

22   that I mean transfer trailer trucks were all arranged and

23   coordinated by Elizondo?

24   A.    For the most part I would say.

25   Q.    And by Stephen Cook?

UNREDACTED TRANSCRIPT

*CROSS - RODNEY WEAVER*

1   A.    Well, Cook was like an underman that was

2   responsible for getting the truck drivers together and

3   getting someone such as Fred on board to distribute it.

4   Q.    So Cook actually introduced Elizondo to Fred Cole?

5   A.    Well, there was some questions about that as to who

6   actually introduced who, but --

7   Q.    That's what you were told by Elizondo, wasn't it?

8   A.    I think so.

9   Q.    So would he know or would somebody else know

10  better?

11  A.    No, he would know.

12  Q.    Okay.  So he says that the person that introduced

13  Fred Cole to him was Cook?

14  A.    I think that's correct, in McAllen, I believe.  I

15  know there was another meeting that took place here at

16  the Denny's Restaurant between Frederick Cole and

17  Elizondo, and I think Maria De la Fuenta may have been

18  there.  There was multiple meetings that took place.

19  Q.    And Cook?

20  A.    Cook was there, yes, sir.

21  Q.    You took two separate -- you have reviewed two

22  separate proffers by Elizondo or Carlos?

23  A.    Yes, sir.

24  Q.    One of those you were present at?

25  A.    I believe I was present on both of them.

UNREDACTED TRANSCRIPT

1    Q.    I'm sorry.

2    A.    I'm sorry.  No, sir, one was a proffer, one was a

3    post arrest interview.

4    Q.    Post arrest statement was taken in Texas?

5    A.    Yes, sir.  I was not present for that one.

6    Q.    But you were for the proffer taken March 12th of

7    2012?

8    A.    No, I think it was –– actually look in the first

9    paragraph.  I think it was like on the 6th or the 7th of

10   March.

11   Q.    March 6th or 7th?

12   A.    Yes, sir.

13   Q.    All right.  But you were present for that?

14   A.    I was, yes, sir.  I did not take the notes.  I

15   typed the report.  But I was present.

16   Q.    This was after you reviewed it, you have reviewed

17   that?

18   A.    Yes, sir.

19   Q.    You didn't make any additions or corrections to it,

20   I take it?

21   A.    Only thing I did was redacted some of the

22   information that was sensitive to other investigations as

23   required by us.

24   Q.    You have a copy you gave me you redacted?

25   A.    Yes, sir.

*CROSS – RODNEY WEAVER*                                                    46

1    Q.    Other than that, did you make any editions or

2    corrections to it other than what you reviewed here?

3    A.    No, sir.

4    Q.    There were other officers present during the taking

5    of this and everybody participated and asked questions?

6    A.    I think K. Lindquist led the investigation or the

7    interview.

8    Q.    She's the same person who had questioned him post

9    arrest?

10   A.    He.

11   Q.    I'm sorry.  He's the same person that questioned

12   Elizondo post arrest?

13   A.    Yes, sir, and I believe there may have been another

14   agent with him at that time.

15   Q.    The proffer took place after everybody had been

16   charged.  Did it take place after he had already pled

17   guilty?

18   A.    I don't think he's pled guilty yet.  I'm not

19   certain on that.

20   Q.    And one of the United States Attorneys was present

21   at the time, you agree with that?

22   A.    Jerry Kitchen, I believe.

23   Q.    Who was handling the case at the time?

24   A.    Yes, sir.

25   Q.    Now, in this proffer Elizondo went through the

UNREDACTED TRANSCRIPT

*CROSS - RODNEY WEAVER*                                                    47

1    operation involving some other things that were

2    sensitive, but let's focus just on what was -- as far as

3    we are here on today.  He went through and outlined his

4    participation, correct?

5    *A.*    Yes, sir.

6    *Q.*    He talks about in paragraph 8 of his -- if you need

7    to see any of these, I'll be glad to let you look at it.

8    *A.*    I know it contains a lot of information.

9    *Q.*    That's fine.  If you want to see them, you tell me,

10   and you are welcome to look at it at any time.

11          We discussed a 271-pound deal involving Terrence

12   Brooks.  You talked about that earlier?

13   *A.*    Yes, sir.

14   *Q.*    You talked about you said Fred was involved in

15   that?

16   *A.*    I testified that there was -- that there was a

17   meeting that took place between Terrence Brooks and

18   Stephen Cook on June the 15th, if I recall my date

19   correctly, where Cook said that they had to provide

20   Frederick Cole proof that the shipment had been seized.

21   That was prior to the August 1st seizure of the

22   271 pounds, but it was in my opinion that I believe they

23   were meeting regarding the previous load that had been

24   seized from Terrence, and Fred even made reference to

25   Terrence Brooks in the telephone call we heard today.

UNREDACTED TRANSCRIPT

*CROSS - RODNEY WEAVER*                                          48

1  Q.    Well, certainly Elizondo knew where that marijuana

2  was headed?

3  A.    Yes, sir, I believe he knew.

4  Q.    Right?  He would know?

5  A.    He said it was coming to Jackson for distribution.

6  Q.    Elizondo said, it's coming to Jackson for

7  distribution?

8  A.    Yes, sir.

9  Q.    I want you to look at paragraph 8.

10 A.    I need to.

11 Q.    I'm going to let you look at it.  Just a second.

12 Let me find the right spot.

13 A.    Maybe look at --

14 Q.    I got the wrong one.  I got the wrong one.  In the

15 post arrest statement, okay, let's go to that one first.

16 Let's do it first because it came first, right?

17 A.    Yes, sir.

18 Q.    That statement was January the 11th of 2011?

19 A.    Yes, sir.

20 Q.    In the post arrest statement, Elizondo was

21 questioned about the 271-pound transaction with Terrence

22 Brooks seized -- it was seized at the border patrol

23 checkpoint, right?

24 A.    Yes, sir.

25          **MR. DONAHOE:**  Now, may I approach, Your Honor?

UNREDACTED TRANSCRIPT

*CROSS – RODNEY WEAVER*                                                              49

1              **THE COURT:**  Okay.

2    **BY MR. DONAHOE:**

3    *Q.*    Take a look at that, Officer Weaver, and tell me if

4    that appears to be the statement of Elizondo post arrest

5    on January –– I'm sorry –– January the 11th of 2011.

6    That's only part.  I know you only have one page.

7    *A.*    Yes, sir.

8    *Q.*    And in paragraph 8, he's discussing the 271 pounds

9    that was seized at the border that Terrence Brooks was

10   driving?

11   *A.*    That's correct.

12   *Q.*    No mention of Fred Cole in that anywhere, is there?

13   *A.*    No, sir, not in that one.  May I see the proffer?

14   *Q.*    Yeah, sure.  I want to get through this one.

15   *A.*    Okay.

16   *Q.*    This statement, time of arrest, no mention of Fred

17   Cole?

18   *A.*    Not in that paragraph, no, sir.

19   *Q.*    Was there another statement at the time of the

20   arrest that I don't have?

21   *A.*    No, sir.

22   *Q.*    There was a discussion also about cocaine that

23   Elizondo was shipping into the country in the post arrest

24   statement, correct?

25   *A.*    I would need to refer to that.

                        UNREDACTED TRANSCRIPT

1    Q.    No problem.  Look at paragraph 9.

2    A.    Yes, sir.

3    Q.    And in his post arrest statement, Elizondo says the

4    cocaine was going to Stephen Cook's relatives in Dallas,

5    Texas?

6    A.    That's correct, which would have been Ethel Foster.

7    Q.    Go on to look at paragraph 10 while you have that.

8    Paragraph 10, there is a discussion of the seizure of the

9    2,251-pound amount that you testified about earlier?

10   A.    Yes, sir.

11   Q.    And that's the amount -- in that post arrest

12   statement, he says the drugs belong to Richard Delarosa,

13   somebody named Juan, last name unknown, and somebody else

14   named Juan, last name unknown?

15   A.    That would be a clarifying yes.  I would like to

16   clarify, if you read into that, the marijuana was being

17   transported for three different sources of supply.  Those

18   sources of supply, according to Elizondo, was Richard

19   Delarosa and two other individuals or two individuals

20   named Juan.

21   Q.    Okay.  He didn't say anything, doesn't talk about

22   who else was involved -- let me ask it this way.  Fred

23   Cole's name is not in that paragraph, is it?

24   A.    Again, I would like to clarify my answer, but that

25   is no because he is referring to the sources of supply

UNREDACTED TRANSCRIPT

CROSS – RODNEY WEAVER                                              51

1    here.  Fred Cole was not a source of supply from Texas.

2    Q.    Let me let you look at paragraph 12.  Paragraph 12

3    there's a discussion -- this is still the post arrest

4    statement, right?

5    A.    Unless -- I believe so, date prepared,

6    January 13th, yes, sir, I believe it is.

7    Q.    The discussion in paragraph 12 by Elizondo

8    indicates that amounts were moved to Atlanta and St.

9    Louis, and in St. Louis, he was introduced to everybody

10   by Stephen Cook?

11   A.    Those individuals in St. Louis, correct.

12   Q.    No mention of Fred Cole in that paragraph?

13   A.    Not in this one, no, sir.

14   Q.    Then in paragraph 13, you have that, too, don't

15   you?

16   A.    Yes, sir.

17   Q.    13?

18   A.    I have part of it.

19   Q.    Well, the rest of it is --

20   A.    Blacked out.

21   Q.    -- blacked out.  In 13, this is in the post arrest

22   statement, he talks about moving money from Memphis to

23   Texas?

24   A.    Yes, sir.

25   Q.    He moved the money, no mention of Fred Cole?

UNREDACTED TRANSCRIPT

*CROSS - RODNEY WEAVER*                                                      52

1   A.    I don't see Fred Cole's name mentioned in this

2   particular paragraph, no, sir.

3   Q.    Right -- and let me give you the rest of it here.

4   In 15, Carlos confirms that all the truck drivers that he

5   was introduced to, all -- they used different drivers

6   over a certain period of time, do you agree?

7   A.    Yes, they did.

8   Q.    And all the driver's were introduced to him by

9   Stephen Cook?  That's 15.

10  A.    Paragraph 15?

11  Q.    Yes.

12  A.    That's what he indicated on this day, yes, sir.

13  Q.    And also in that statement in paragraph 22, he

14  reported a 50-pound transaction that was set up by

15  somebody named Jackson and somebody named Carlos?

16  A.    What now?

17  Q.    Paragraph 22.

18  A.    Paragraph 22, and what's the question again?  Yes,

19  sir, that he used a guy by the name of Jackson.  That

20  person has been identified as well.

21  Q.    That was in the 50-pound transaction that he

22  referenced that they actually said what about this

23  50-pound transaction, and he talked about it?

24  A.    Yes, sir, and he said that the 50 pounds was

25  delivered to Cole.

UNREDACTED TRANSCRIPT

1    *Q.*    Not in that statement he doesn't?

2    *A.*    It says it right here.

3    *Q.*    22?

4    *A.*    Yes, sir, it says --

5    *Q.*    Let me see.

6    *A.*    Let me read it to you, phone number is

7    (731)325-6325 used by Jackson, last name unknown, was

8    saved under the name JKS.  Just prior to Elizondo's

9    arrest, Elizondo transported 50 pounds of marijuana to

10   Jackson, Tennessee area.

11   *Q.*    That's one we admitted --

12   *A.*    Jackson, last name unknown, was responsible for 20

13   pounds of the marijuana and Delarosa was responsible for

14   the remaining 30.  The 50 pounds were delivered to Cole.

15   *Q.*    Right, that's the one we said we admitted earlier,

16   that paragraph we withdrew that objection to.

17   *A.*    Yes, sir, but it does say that 50 pounds was

18   delivered to Cole.

19   *Q.*    Right.  I got it.

20          The proffer, let's get on to it.  Again, if you

21   need to see it, let me know.  In the proffer that he

22   gave, Elizondo indicated he met Cook and Davis, who he

23   called -- you referenced earlier as Cheese or

24   Cheeseburger, that he met them first in order to

25   transport illegal aliens?

                    UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                        54

1   A.   Yes, sir, that's what he said.

2   Q.   And then they graduated into moving marijuana and

3   other drugs?

4   A.   I don't know if it was actually a graduation or

5   whether the illegal aliens was just extra bonus or what,

6   but anyway --

7   Q.   With Cook and Davis he also moved lots of other

8   shipments, a lot of other pounds that had nothing to do

9   with Fred Cole, do you agree?

10  A.   No, and I'll explain why.  There was another call

11  that was taking place where Fred was ranting and raving

12  because Timothy Davis had transported a load of

13  approximately a thousand pounds to Atlanta, and Fred was

14  cut out of that deal, and he was highly irate about it

15  because he was supposed to make a payday of fifty or a

16  hundred thousand dollars out of that deal, and he was

17  extremely irate and discussed that.

18  Q.   That's not in Elizondo's statement and proffer

19  anywhere, is it?

20  A.   No, sir, there was a Fred -- Fred made a phone call

21  about it.  I think we have that today.  I'm not certain.

22  Q.   Right.  That's not in Elizondo's statement.  He

23  never mentioned that, never says that, never references

24  it, does he?

25  A.   Well, without looking at it in depth, I would go

UNREDACTED TRANSCRIPT

1   with your statement there.

2   Q.    In paragraph -- they move a 300-pound shipment,

3   Elizondo, Cole -- I'm sorry -- Elizondo, Cook and Davis

4   move a 300-pound shipment in 2009 to Edinburg, Texas?

5   A.    Well, I would have to look at that because

6   Edinburg, Texas, is directly like a suburb or, so to

7   speak, of McAllen, so it would have had to have left

8   Edinburg.

9   Q.    You are right, it did leave Edinburg.  This was the

10  shipment for Garza, do you remember that one?

11  A.    Not without looking at the statement.  There is so

12  much and so much, so much drugs being moved here, that it

13  is hard to keep up with without looking at it.

14  Q.    He also indicated that Cook introduced Elizondo to

15  Fred Cole; do you agree with that, that's what Elizondo

16  told you?

17  A.    I think so, yes, sir, best of my knowledge.  I

18  believe I did testify earlier that there was some

19  discrepancy or question as to who really introduced who.

20  Q.    That's what Elizondo said, right?

21  A.    If it's in that statement, I agree with that.

22  Q.    The trafficking between Elizondo, Cook, Davis and

23  others began before Elizondo even met Fred Cole, right?

24  A.    I'm trying to think of the time line.  I'm

25  referring back to February of 2010 in my mind, and I know

UNREDACTED TRANSCRIPT

1  that there was a load -- no, because Frederick Cole was

2  involved in the 200 to 500 pounds that was in Jesse

3  Cook's house, which would have been September or October

4  of 2009, which was prior to the February 2010 seizure

5  where Timothy Davis was involved.

6  Q.   Elizondo doesn't even talk about that shipment,

7  does he?  It's not even in the statement, the proffer,

8  it's not even there?

9  A.   I don't know.  I will have to look at it.

10 Q.   No problem.  Let's go up and take a look at it, and

11 I'm handing you up paragraph 12 of Elizondo's proffer to

12 you and the other officers.

13 A.   I would need to see the entire -- because I do have

14 on my notes where he said that.  I need to see the entire

15 proffer.

16 Q.   Let's talk about the first 12 paragraphs.

17 A.   Okay.

18 Q.   Then you can look at it if you want to.  In the

19 first 12 paragraphs, the first 11 paragraphs don't

20 mention Fred Cole.  Paragraph 12 is the first time he

21 says, I was taken to Jackson and introduced to Fred Cole

22 at a empty house.

23 A.   Unless my eyes fail me, that would be correct.  And

24 Fred actually talked about that stash house on the wire

25 as well.  So we did know about that.  So that was

CROSS - RODNEY WEAVER                                                    57

1   confirmed.

2   Q.    Okay.  So they were -- they already had their

3   operation moving.  You got -- he has indicated in his

4   proffer that they were moving amounts of drugs prior to

5   him even meeting Fred Cole.

6   A.    I would agree that that's how this is written, but

7   I'm not certain of the exact time line because experience

8   tells when you are talking to people certain things come

9   to mind during a conversation, and that's when it's

10  recorded.

11  Q.    Have you or the U.S. Attorney's Office notified

12  Elizondo or his attorney that his proffer is inconsistent

13  and is not to be believed?

14  A.    No, sir, because I don't -- I don't see anything in

15  my opinion that would warrant that.

16  Q.    They then go on to discuss in paragraph 13 setting

17  up a shipment to Memphis, a $30,000 deal?

18  A.    300 pounds of marijuana, yes, sir.

19  Q.    Fred Cole is not involved in that, according to

20  Elizondo, is he?

21  A.    Does paragraph 13 end with S. Cook?

22  Q.    Yes, that goes with it.

23  A.    No, sir, I don't see that, where Fred is mentioned

24  in that paragraph.

25  Q.    Then they discuss in 14 about getting another

                        UNREDACTED TRANSCRIPT

*CROSS - RODNEY WEAVER*                                                    58

1    transfer truck, Cook getting him another truck?

2    *A.*    To purchase a truck?

3    *Q.*    Uh-huh.

4    *A.*    Yes, sir.

5    *Q.*    Then in paragraph 18 of his proffer to you guys,

6    they discuss a big shipment to Memphis of 500 pounds?

7                **THE COURT:**  Hold on, Mr. Donahoe.  See what

8    the marshal needs.

9                **MR. DONAHOE:**  Yes, sir.

10                My client is requesting a short recess, Your

11   Honor.

12                **THE COURT:**  All right.  We will take about a

13   ten-minute recess.

14                **THE CLERK:**  All rise, please.  This Honorable

15   Court stands in recess.

16                (Recess).

17                **THE COURT:**  All right.  Mr. Donahoe, you can

18   proceed.

19                **MR. DONAHOE:**  Thank you, Your Honor.

20   **BY MR. DONAHOE:**

21   *Q.*    The shipment that came to Jesse Cook's house in

22   Gadsden you referenced earlier, Elizondo says that was a

23   hundred pounds; do you agree with that?

24   *A.*    No, sir.  I've got my notes here that it was

25   500 pounds, but Cook said it was 200, but it was not less

                        UNREDACTED TRANSCRIPT

1  than 200.  Also Jesse Cook said that it was 500 pounds.

2  Q.    And Elizondo says it's a hundred pounds, right?

3  A.    I would have to look at that, sir.

4  Q.    All right.  Let's look at paragraph 24.

5        I'm sorry, it's paragraph 28.

6  A.    Yes, sir, that's what he said in paragraph 28, yes,

7  sir.

8  Q.    This is in his proffer to you guys altogether, this

9  is after indictment, maybe even after he pled guilty, he

10  says it's a hundred pounds that went to Jesse Cook in

11  paragraph 24?

12  A.    You mean after Elizondo pled guilty?

13  Q.    I'm sorry, after Elizondo, yes.

14  A.    I don't think he's pled yet.

15  Q.    Fine.  But once again, you have done it for him,

16  did you believe any of this statement to be false?

17  A.    Not as it started.  It ended up being a total of

18  350 pounds total.

19  Q.    A hundred pounds went to Jesse Cook in Jackson?

20  A.    That's what Elizondo --

21  Q.    That's what Elizondo says?

22  A.    Yes, sir.

23  Q.    Elizondo goes on to say that he didn't trust Fred

24  Cole to sell it, doesn't he?

25  A.    That's true, he doesn't trust Fred.  He had to call

UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                        60

1   and get Fred's permission to let Fred --

2   Q.    So he sent it to Memphis first, then later after it

3   all didn't sell back in Memphis, he brought 80 pounds

4   back to Fred?

5   A.    I need to see paragraph 30.  27, 28, 29 is all I

6   got right here.

7   Q.    It should be in 29 -- 28, yeah, you are right.

8   A.    Originally it was supposed to go to Atlanta.

9   However, Cole arrived at the residence of Jesse Cook,

10  which is reflected J. Cook here in the report, and agreed

11  to sell the marijuana.  Two unnamed individuals arrived

12  in Jackson and met with Elizondo and Fred.  The guy who

13  owned the dope, who was one of the sources of supply,

14  decided to leave the marijuana in Jackson to be sold by

15  Cole.  Elizondo did not trust Cole to sell all the

16  marijuana, so Elizondo in turn contacted another person

17  to see if he could do that.  I'm just paraphrasing.

18  Q.    He sent it to Memphis first?

19  A.    Well, it come through Memphis.

20  Q.    80 pounds ends up with Cole?

21  A.    A few days later.  It says that there was an

22  additional 70 or 80 pounds that was returned to Cole

23  because they had trouble selling it.

24  Q.    Right, they couldn't sell it in Memphis, 80 pounds,

25  70 to 80 pounds came back to him here; that's what

UNREDACTED TRANSCRIPT

1    Elizondo says?

2    A.    Interpreting this, I would agree with that, but I

3    got two other people that said it was more than that,

4    so --

5    Q.    So Elizondo is not telling the truth?

6    A.    No, sir.

7    Q.    Well, somebody is not telling the truth.

8    A.    I think when you are dealing with that amount of

9    weight that --

10   Q.    They don't really know, do they?

11   A.    It's easy to get off just a few pounds but --

12   Q.    Well, this one is off a few hundred pounds?

13   A.    Right, no, about maybe a hundred.

14   Q.    So a hundred pound error is not any big deal?

15   A.    Not on this level.

16   Q.    Okay.  So if we are off a hundred here and hundred

17   there, it's no big problem?

18   A.    Except for.

19   Q.    I'm sorry, let me ask it a different way.  It's not

20   uncommon for them to be off on their amounts?

21   A.    No, sir, but we do have lab reports to reflect the

22   seizures that are correct.

23   Q.    On the ones that were seized, but we are not

24   talking all the time about -- we are not always talking

25   about seizures, are we?

UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                                62

1    A.    No, sir.

2    Q.    So these amounts may be accurate, and they may not

3    be accurate?

4    A.    I believe for the most part, based on cooperation

5    of other individuals, that they are close, yes, sir.

6    Q.    Close, but we don't really know, do we?

7    A.    I was not there with a set of scales, no, sir.

8    Q.    No pictures of any of it other than your one

9    surveillance of the three packages?

10   A.    Right.

11   Q.    Other than that one time, we don't have photos of

12   any of these things?

13   A.    No, sir.

14   Q.    All right.  Thank you.  Carlos then moved a

15   1600-pound shipment into Atlanta that didn't have

16   anything to do with Fred, did it?

17   A.    I think I testified earlier that there was a load

18   that went to Atlanta, and there was a call about that.

19   And I don't know if we have that here today or not, but

20   there was a call where Fred was ranting and raving about

21   a load that went to Atlanta he was supposed to get a cut

22   out of and get a payday of fifty or a hundred thousand

23   dollars, and they cut him out of it, and he was not happy

24   about it.

25   Q.    Nowhere in this statement from Elizondo, who moved

UNREDACTED TRANSCRIPT

1    the dope, does it ever say that about Fred or that he

2    called and complained or anything else, does it?

3    A.    I don't think so, no, sir.

4    Q.    In the statement from Elizondo, proffer, he says he

5    moved 1600 pounds to Atlanta, and nowhere in that

6    1600-pound shipment, transaction does it mention Fred

7    Cole's name?

8    A.    If the report reflects that, that would be correct.

9    Q.    Then they moved another 500 and another 200-pound

10   transaction to Memphis, same situation, never mentioned

11   Fred, didn't have anything to do with it?

12   A.    No, sir, I'm not disputing that Fred Cole was not

13   the original source of supply from Texas.  He was only

14   tasked with distributing once it arrived here.

15   Q.    And not always when it arrived here, according to

16   Elizondo, right?

17   A.    Not always?

18   Q.    Right.

19   A.    There were -- I believe there were other loads that

20   Fred may or may not have participated in, but the ones

21   we've covered here today, he did.

22   Q.    In his proffer, Elizondo talks about cocaine

23   shipments; do you agree?

24   A.    I remember that, yes, sir.

25   Q.    Not once ever anywhere does he ever mention that

UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                                    64

1    Fred Cole had anything to do with any of the cocaine

2    shipments, does he?

3    A.    If the report reflects that, I would agree with

4    that but I do remember a call where -- no, I take that

5    back.  The call I was going to refer to was between Cook

6    and Cole.

7    Q.    So according to Elizondo, Fred had nothing to do

8    with the cocaine ever, right?  He's never mentioned in

9    the proffer?

10   A.    On the Elizondo's part, and again, I don't dispute

11   any fact that Frederick Cole was connected to the

12   supplier of any of the marijuana or cocaine in the Texas

13   area.  Elizondo was responsible fairly much for that.

14   Q.    Elizondo never mentions Cole distributing any of

15   the cocaine in his proffer, does he?

16   A.    If the report reflects that.

17   Q.    As a matter of fact, in the phone call we heard

18   earlier, Cole talks about -- when Cook is trying to sell

19   him the cocaine, he's saying, that's not my cup of tea,

20   do you remember hearing that?

21   A.    Yes, I remember that.  My understanding there they

22   were talking about the transportation of it.  Come get

23   it, how to get it here, how to get it there.

24   Q.    Again, you are guessing at it, right?  Do you

25   remember this statement, I ain't doing nothing like that?

                    UNREDACTED TRANSCRIPT

1    That was in there, too, right?

2    A.    Also it could have been referring to the price of

3    the --

4    Q.    I don't want to know could have been --

5              **UNIDENTIFIED SPEAKER:**  Right.

6    **BY MR. DONAHOE:**

7    Q.    -- you didn't talk to Fred Cole about what he meant

8    when he said this at any time, did you?

9    A.    It would just be my opinion.

10   Q.    Now, the shipment you talked about that was

11   intercepted that we talked about a little earlier where

12   in the first post arrest statement, yeah, the over 2,000

13   pounds that was intercepted at the border, I want to make

14   sure that I got this correct, Cole was only intended to

15   be -- to get 150 pounds of that, according to Cook in his

16   proffer?

17   A.    Yes, sir, that's my understanding.

18   Q.    Now, you said earlier that they were charging him

19   $800 a pound; is that right, because he was complaining

20   it was too high?

21   A.    No, sir, that was Billy Dowell.  What I'm

22   remembering is the marijuana being shipped from

23   California.  We discussed the 800 pounds on that.  I

24   don't recall discussing -- I think I testified that there

25   was a price discussed, but I didn't testify to that

UNREDACTED TRANSCRIPT

CROSS – RODNEY WEAVER                                          66

1    amount.

2    Q.    I'm sorry, I thought you said that $800 a pound was

3    consistent with the amount with the pricing here in

4    Jackson?

5    A.    That is consistent.

6    Q.    Okay.

7    A.    But we were referring to, from what I recall, that

8    testimony was about the marijuana from California because

9    it was a higher grade, and Mr. Wilson was asking about

10   the amount of money that was transferred to Billy Dowell

11   in California.

12   Q.    So out of the -- just, once again, I just want to

13   make sure I'm clear; according to Cook, the only portion

14   of the shipment that was supposed to go to Cole would be

15   150 pounds?

16   A.    That's what Cook understood, yes, and, I'll even go

17   on to say that I think where you are going is the price

18   was discussed that Fred was selling between $900 and

19   $1200 a pound which was consistent here as well, but they

20   were going to charge Cole, being Cook, and was going to

21   charge Fred $600 a pound, so Fred was going to make three

22   to $600 a pound if it was sold at that.

23   Q.    Now, you referenced a transaction between Cole and

24   Vincent Berry, that was the one that you had surveillance

25   on?

CROSS - RODNEY WEAVER                                                    67

1    A.    Yes, sir, myself and other members of the DEA.

2    Q.    That turned out to be three small bundles?

3    A.    That's what we saw, yes, sir, being exchanged

4    hands.  Personally TFO George Stauffer observed that.

5    Q.    And you were told by Fred Cole that those weighed

6    five pounds apiece?

7    A.    That's what Fred said, but other cooperating

8    defendants who also -- Ethel Foster in particular, who

9    retained part of that, the weight is described even by

10   Vincent Berry as being 20 pounds apiece.

11   Q.    So 60 pounds worth then, three bundles, 20 pounds

12   apiece, maximum of 60?

13   A.    But on the telephone call -- I don't know if we

14   played that today or not, but it was discussed that there

15   was five bundles.

16   Q.    You only saw three?

17   A.    That's all we saw.

18   Q.    On surveillance?

19   A.    As we were driving by, they were throwing three big

20   bales off the back of a 18-wheeler into Fred Cole's car.

21   Q.    So we are talking about 60 pounds there that we

22   know of, but Carlos says that was 200 in his proffer to

23   you guys, right?

24   A.    I wouldn't dispute that because part of that was

25   left in Texas.  I think that's what he's referring to.

                    UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                          68

1   There was a total of -- I can't remember the exact total,

2   but there was a larger amount that was originally to

3   leave McAllen.  They busted that into half, transported

4   half of it to Dallas, dropped half of that in Dallas and

5   brought Fred the rest, which would have been the three to

6   five bundles.

7   Q.   That you saw three of?

8   A.   That we saw three of.

9   Q.   That you got estimates anywhere from 5 to 20

10  pounds?

11  A.   That's what Fred said was 5, but those --

12  Q.   Somebody else said 20?

13  A.   That's what the other defendants described it as,

14  but according to what TFO Stauffer told me that he saw,

15  they were larger bales than what would have been

16  5 pounds.

17  Q.   So when Elizondo says, Cook left a hundred

18  pounds -- I'm sorry -- the remaining 200 pounds were

19  taken by Cook to St. Louis --

20  A.   I think that's a different load.

21  Q.   Right after that it says, reference DEA 6 entitled

22  Surveillance of Fred Cole and Vincent Berry in Jackson,

23  Tennessee prepared by TFO Rodney Weaver, April 14th.

24  That's not a different load, is it?

25  A.   Let me read that.  Once again, I didn't take these

UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                    69

1   notes and I didn't record it as -- this is K. Lindquist

2   writing this report.  That may have been how he

3   interpreted it.

4   Q.   So it could be interpreted different ways; is that

5   what you are saying?

6   A.   No, sir, hold on just a minute.  Okay.  What this

7   is saying here is, what happened is, I described earlier

8   that there was a large amount of marijuana, and I'm

9   afraid to throw a number out there, but I'm wanting to

10  say it was like a thousand pounds or so, and they only

11  sent half of it to Dallas and they offloaded --

12  Q.   They would be Carlos and Cook?

13  A.   I don't remember if Elizondo was in Dallas at the

14  time or not.  Cook was there.  Vincent Berry was there.

15  Q.   Not Fred Cole?

16  A.   Ethel Foster.  Fred was not there.  Fred was

17  waiting in Jackson on the hundred pounds to get to him or

18  the bundles.

19  Q.   That turned out to be three bundles that we know

20  are anywhere from 5 to 20?

21  A.   Then what they done is they offloaded

22  approximately, what Elizondo is saying, a hundred pounds

23  in Dallas for Ethel and Larry.  Then they transported

24  approximately -- the bundles that you are in question

25  there to Fred and then an additional 200 pounds was taken

UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                          70

1    by Cook to St. Louis to a source for a person that they

2    were supplying in St. Louis, which Fred ended up going to

3    St. Louis later on and picking up about 200 pounds at a

4    later time.

5    Q.    But nowhere anywhere is it mentioned in Elizondo's

6    statement what you just said about Fred going to St.

7    Louis and picking up 200 pounds?

8    A.    I don't think Elizondo was there.  Vincent Berry

9    and Stephen Cook confirmed that, and also Fred talked

10   about going to St. Louis on the wire dealing with his

11   people.

12   Q.    What page is that you have?

13   A.    I have page 22.

14   Q.    The amount they moved to St. Louis Elizondo got

15   $80,000 out of, right?

16   A.    I think that's what the report reflects.  It's a

17   lot of money.

18   Q.    Brooks then was stopped at a checkpoint, and they

19   took out 271 pounds when he had that, right?

20   A.    That's correct.  I believe that was August the 1st,

21   2010.

22   Q.    Elizondo does not mention that that was headed to

23   Fred or to anyone else or he was involved in that, does

24   he?

25   A.    Let me see the -- let me see the entire proffer.

                    UNREDACTED TRANSCRIPT

CROSS - RODNEY WEAVER                                                71

1    Q.    Paragraph 8.

2    A.    I would need to see the -- I need to see the entire

3    proffer.  I would agree that it's not mentioned in the

4    paragraph 80, but in order to make a clearer

5    interpretation, I need to review the whole page 1 through

6    33 of the proffer.

7    Q.    You can look at it.

8          Right after that is when Cook recruits his new

9    driver, Cherry, right?

10   A.    I believe the time frame is correct on that because

11   Cherry was seized, I believe if my memory serves me

12   correctly, September the 24th, 2010.

13   Q.    At no time does Elizondo ever reference or mention

14   any weapons, that he's ever seen Fred Cook with any, ever

15   known of him to have any or anything like that, correct?

16   A.    I can't recall, but I'm not saying there might not

17   be something mentioned either in the wire or something

18   out there, countless hours of calls.

19   Q.    I'm talking about the proffer that he gave to all

20   these investigators with the U.S. Attorney present and

21   knew everything about the case, nowhere in that proffer

22   is it mentioned, is it?

23   A.    Not that I remember reading.

24   Q.    The investigation that you ran also indicated that

25   Fred Cole never kept any drugs at his residence, do you

1    agree with that?  You referenced a safe house, stash

2    house earlier.

3    A.    Yes, sir, but I disagree with that because on April

4    the 15th, we had air surveillance on Frederick Cole after

5    he picked up the bundles of marijuana from Vincent Berry,

6    and he drove at a very, very high rate of speed where

7    ground control could not keep up with Mr. Cole going down

8    the interstate.  We had air surveillance who surveilled

9    him directly to 94 Spindrift drive in Jackson which is

10   the residence of Frederick Cole.

11   Q.    Did you keep -- you don't have any -- I'm sorry.

12   You said you had air surveillance?

13   A.    Yes, sir.

14   Q.    And he was there how long?

15   A.    I don't know the air surveillance.  He got out,

16   went in the house and of course the helicopter couldn't

17   hover over the house.

18   Q.    So you don't know whether he actually brought it

19   into the home or not in any case at that time?

20   A.    I know he took it there.  What he done with it

21   after that I do not know.

22   Q.    So he rode in the car, stopped in the driveway,

23   other than that, you don't know what happened to it?

24   A.    And Fred went in.

25   Q.    Correct.

UNREDACTED TRANSCRIPT

*CROSS - RODNEY WEAVER*                                                73

1   A.    That's all I know.  There was a reference on the

2   wire, though, where Fred had weed in the house but just

3   small amounts.

4   Q.    You didn't find any when you searched?

5   A.    I don't believe we did, no, sir.

6   Q.    You didn't find anything to indicate -- you didn't

7   find any drugs anywhere close to the weapons that you

8   referenced that were found?

9   A.    If the report reflects that, I don't believe so.  I

10  know the guns were found in like the drawer beside the

11  bed.

12  Q.    Fred told us earlier in his life, you were aware,

13  was a victim of a shooting where he was a victim of a

14  crime; you are aware of that?

15  A.    He said that.

16  Q.    He's got the bullet, got the scars to prove it,

17  too?

18  A.    I'm not refuting that.  I'm just saying that's the

19  only knowledge that I have of it.

20  Q.    Fred Cole sat down with you and other agents and

21  made a proffer on two separate occasions, do you agree?

22  A.    I only particularly remember one with me directly,

23  and then I think there might have been another one where

24  there was other agents there, but I was not directing

25  that proffer if I recall correctly.

                    UNREDACTED TRANSCRIPT

CROSS – RODNEY WEAVER                                              74

1  Q.   Cole told you in a post arrest statement on the

2  shipment that was coming in that -- the big shipment, the

3  2,000 pounds that he was supposed to get 150 of,

4  according to Cook; Cole told you that Elizondo had said

5  he was supposed to get some of it, but he didn't believe

6  it, he didn't believe that he was going to get any of it?

7  A.   I would have to look at that statement to read it

8  word for word.  I don't have it.

9  Q.   It's in your notes.

10 A.   No, that's basically what he said, but at what

11 point he said that, I would like to receive -- at what

12 point he made that statement because I know there was two

13 statements there; first maybe he said that, yeah, I was

14 getting part of it, and then after he realized -- I would

15 like to see what time frame he said that in because --

16 Q.   I'm just reading your notes.

17 A.   The longer he -- my notes here are taken from the

18 proffer, okay.

19 Q.   Well, I'm just reading your notes, Cole's post

20 arrest statement said that Carlos told him he was to get

21 part of the shipment, but he didn't believe Carlos.

22 That's what you wrote down.

23 A.   I would agree with that.

24        **MR. DONAHOE:**  May I have just a moment, Your

25 Honor?

UNREDACTED TRANSCRIPT

1                   **THE COURT:**  Okay.

2              (Pause).

3    **BY MR. DONAHOE:**

4    *Q.*    Officer Weaver, you conducted surveillance of Fred

5    Cole when he went to Memphis to pick up a music act, Paul

6    Wall?

7    *A.*    Yes, sir.

8    *Q.*    So he was actually involved in the promotion of

9    music events here in Jackson?

10   *A.*    I know he went and picked up a music rapper.

11   *Q.*    And you questioned him about Yo Gotti also, who is

12   a local musician?

13   *A.*    I did because they talked about him some on the

14   wire.

15   *Q.*    Right.  And Fred Cole told you that some of the

16   money that was shipped that was sent wire transfer was

17   involving some of the music promotion, not all of it, but

18   some of it?

19   *A.*    After he realized what he had done by making a

20   statement of initially admitting that it was all drug

21   proceeds.

22   *Q.*    So did he tell you that or not?

23   *A.*    He did.

24              **MR. DONAHOE:**  Okay.  That's all I have, Your

25   Honor.

*CROSS - RODNEY WEAVER*

1              **THE COURT:**  Thank you.

2              Any redirect, Mr. Wilson?

3              **MR. WILSON:**  Very briefly, Your Honor.

4                     REDIRECT EXAMINATION

5    **BY MR. WILSON:**

6    *Q.*    Officer Weaver, do you recall a telephone call

7    intercepted by Frederick -- from Frederick Cole back on,

8    the period of June 17th, 2010 where the defendant talked

9    about dealing straight with the gulf cartel, a $200,000

10   run by Cook, and his part was $50,000?

11   *A.*    Yes, sir.

12             **MR. DONAHOE:**  I'm sorry, Your Honor, but I

13   don't know how this is appropriate redirect.  I didn't

14   ask anything about this conversation or anything

15   connected to that.

16             **THE COURT:**  Mr. Wilson?

17             **MR. WILSON:**  Your Honor, I believe Mr. Donahoe

18   asked extensively about Mr. Delarosa and Mr. Cook's being

19   somehow involved in the transportation of the marijuana

20   across the border and implied there is a line of

21   questioning that Mr. Cole was only involved on the

22   Jackson end, and I'm using that to show the court --

23             **THE COURT:**  Is that what this is related to?

24             **MR. WILSON:**  Yes, sir.

25             **THE COURT:**  All right.  Mr. Donahoe?

                     UNREDACTED TRANSCRIPT

REDIRECT − RODNEY WEAVER                                          77

1          **MR. DONAHOE:**  We didn't question at all about

2      Mr. Cole being in Texas or just being there or doing --

3      in the relationship, it was very clearly stated by the

4      officer that he was not one of the suppliers and never

5      was a supplier.

6          **THE COURT:**  Well, as I recall from your

7      questioning, Mr. Donahoe, you created the -- at least the

8      impression or trying to establish that Mr. Cole was only

9      involved with 150 pounds and not the full shipment.

10         **MR. DONAHOE:**  Yes, sir, that's correct, but --

11         **THE COURT:**  I understand that's what

12     Mr. Wilson is trying to establish, that Mr. Cole possibly

13     was involved with the full shipment.

14             Is what you are trying to establish?

15         **MR. WILSON:**  No, Your Honor, this is a $50,000

16     debt, and Mr. Cole talking he was dealing with someone

17     straight from the gulf cartel.

18         **THE COURT:**  What does it relate to as far as

19     the quantities that are described in the PSR?  Are you

20     just trying to establish particular quantities or just

21     overall dealings, or what are you addressing?

22         **MR. WILSON:**  Your Honor, I believe its main

23     importance would be just as dealings in his status in the

24     conspiracy in relation to Mr. Cook as well as Elizondo.

25         **THE COURT:**  Well, let me ask in that regard

UNREDACTED TRANSCRIPT

*REDIRECT – RODNEY WEAVER*                                                      78

1    then –– Hold on just a second.  Mr. Donahoe, do you still

2    maintain your objection to paragraph 45 as it relates to

3    Guideline 3B1.1(b) as far as whether or not Mr. Cole

4    would qualify as a manager or supervisor in the criminal

5    activity?

6              **MR. DONAHOE:**  May I have just a moment, Your

7    Honor?

8              **THE COURT:**  Okay.

9              **MR. DONAHOE:**  Yes, Your Honor.

10             **THE COURT:**  All right.  Then I'll allow

11   Mr. Wilson to ask the question.  Go ahead.

12   **BY MR. WILSON:**

13   *Q.*    Do you recall that phone call?

14   *A.*    I do.  That's the call that I testified to earlier

15   that a shipment was done that Cole was to participate in,

16   but he was cut out of it, and he was not aware of it, and

17   he was mad because he didn't get his payment for that.

18   *Q.*    This is actually the Atlanta ––

19   *A.*    Yes, sir.

20             **MR. WILSON:**  Okay.

21             (An audio recording was played)

22   **BY MR. WILSON:**

23   *Q.*    I believe you testified earlier, sir, this was in

24   reference to the Atlanta run that Cook made?

25   *A.*    Yes, sir, that Cook and Timothy Davis participated

UNREDACTED TRANSCRIPT

*REDIRECT – RODNEY WEAVER*                                              79

1   in, and based on that call, it's my opinion that they

2   took Cole's people who he works with, being the

3   suppliers, and cut him out of the deal, and he didn't get

4   paid for it and he was assuming that he was going to.

5           **MR. DONAHOE:**  I want to make sure I haven't

6   waived any objection that I might have to his

7   interpretation of my client's state of mind, again, Your

8   Honor, as I mentioned earlier.

9           **THE COURT:**  All right.  I'll note your

10  objection.

11          **THE WITNESS:**  I also would say --

12          **MR. WILSON:**  That's okay.

13  **BY MR. WILSON:**

14  *Q.*   Sir, over the course of the wire, did you review

15  numerous conversations Mr. Cole had with Charles

16  Elizondo?

17  *A.*   Yes, sir.

18  *Q.*   Did you review numerous conversations Mr. Cole had

19  directly with Delarosa?

20  *A.*   Yes, sir.

21  *Q.*   Did you review numerous conversations that Mr. Cole

22  had with Stephen Cook?

23  *A.*   Yes, sir.

24  *Q.*   And was Mr. Cole dealing directly with these

25  individuals to obtain marijuana?

UNREDACTED TRANSCRIPT

*REDIRECT — RODNEY WEAVER*                                                    80

1   A.    Yes, sir.

2              **MR. WILSON:**  That's all the questions I have

3   of the officer.

4              **THE COURT:**  All right, sir.  You can step

5   down.  Thank you.

6              (Witness excused).

7              **THE COURT:**  All right.  Counsel, let's take

8   our lunch break.  It's 12:30.  Let's be back and ready to

9   go at 1:30.

10             **MR. WILSON:**  Yes, sir.

11             **THE COURT:**  We'll stand in recess.

12             **THE CLERK:**  All rise, please.  This Honorable

13  Court now stands in recess until 1:30.

14             (Recess).

15             **THE COURT:**  All right.  Are we ready to

16  proceed?

17             **MR. WILSON:**  Yes, Your Honor.

18             **THE COURT:**  Mr. Wilson, call your next

19  witness.

20             **MR. WILSON:**  We would call Agent Rusty Colon.

21

22

23

24

25

UNREDACTED TRANSCRIPT

1                              **RUSTY COLON,**

2     having been first duly sworn, took the witness stand and

3     testified as follows:

4              **MR. DONAHOE:**  Could I have just a moment, Your

5     Honor?

6              (Counsel conferred.).

7              **MR. DONAHOE:**  Your Honor, before we begin,

8     could I have just about a minute?  I need to discuss

9     something with my client before we start.

10             **THE COURT:**  All right.  Go ahead.

11             **MR. DONAHOE:**  Thank you.

12             (Counsel conferred.)

13             (Pause).

14             **MR. DONAHOE:**  Your Honor, may we approach?

15             (The following occurred at the bench:)

16             **MR. DONAHOE:**  Do we need it on the record?

17             **MR. WILSON:**  I think everything is on the

18    record.

19             **MR. DONAHOE:**  Your Honor, Mr. Wilson and I are

20    having a discussion that might alleviate the hearing

21    entirely.  My client is asking what we have discussed and

22    what I have discussed with him.  He needs about five

23    minutes to weigh in, and I really need to be able for him

24    to talk to his mother, if possible, or at least talk to

25    her, and I don't know how we are going to do that.  I

*DIRECT – RUSTY COLON*                                                          82

1    don't know whether the marshals will allow it, but I can

2    tell you that he is heading in the right direction right

3    now.  If I didn't think it were worth doing, I would not

4    ask Your Honor for the time.  I know it's very valuable.

5            **THE COURT:**  You agree that it's worth

6    pursuing?

7            **MR. WILSON:**  Yes, Your Honor.

8            **THE COURT:**  Okay.  Well, I'll give you about

9    15 minutes to see.

10           **MR. WILSON:**  That's more than --

11           **MR. DONAHOE:**  That's more than enough.

12           **THE COURT:**  As far as the marshals are

13    concerned, I'll leave that up to them.  It's my

14    understanding --

15           **MR. DONAHOE:**  If they don't do it, that's

16    okay.

17           **THE COURT:**  I think they'll do it, but it's

18    only in lockup, and you'll have to ask them about it.  If

19    they say yes, I'm okay with it.  If they say, no --

20           **MR. DONAHOE:**  I certainly understand.

21           **THE COURT:**  Okay.

22           **MR. DONAHOE:**  Thank you very much.

23           (The following occurred in open court:)

24           **THE COURT:**  All right.  We will take about a

25    15-minute recess.  You'll need -- if you will just recess

UNREDACTED TRANSCRIPT

*DIRECT - RUSTY COLON*                                                        83

1    for about 15 minutes.

2              **THE CLERK:**  All rise, please.  This Honorable

3    Court now stands in recess.

4              (Recess).

5              **THE COURT:**  You need to have a side bar?

6              (The following occurred at the bench:)

7              **MR. DONAHOE:**  Your Honor, we have reached an

8    agreement to recommend to Your Honor.  The government and

9    the defendant are willing to accept a sentence of 151

10   months.  The government has agreed to recommend that.

11             **THE COURT:**  How much?

12             **MR. DONAHOE:**  151.

13             **THE COURT:**  All right.  Go ahead and let me

14   hear the rest of it.

15             **MR. DONAHOE:**  I don't really think under our

16   current guidelines that the court necessarily has to

17   reach resolutions to all the issues that were -- that

18   have been raised as far as making specific findings one

19   way or another.  From a logical standpoint, we think if

20   you take a level 26, which is probably where the drug

21   amount now after the testimony would be, if you add in

22   three for the obstruction enhancement, if you add two for

23   the guns and you add the other two, which seems doubling

24   up to me, for the -- what am I --

25             **THE COURT:**  Manager.

                        UNREDACTED TRANSCRIPT

*DIRECT - RUSTY COLON*                                                              84

1          **MR. DONAHOE:**  -- manager, three for the

2    manager role, I'm sorry, that's seven more.  That puts it

3    at 188.  If you have a two-level reduction either from

4    acceptance of responsibility --

5          **THE COURT:**  Hold on one second.  That sounds

6    low, but I guess you looked at this.

7          **MR. DONAHOE:**  Yes, sir, we have.

8          **THE COURT:**  I mean, so if we could say a 26 --

9          **MR. DONAHOE:**  Yes, sir, if you start at 26 --

10          **THE COURT:**  -- seven more would be a 33.

11          **MR. DONAHOE:**  33, yes, sir.

12          **THE COURT:**  188 to 235.

13          **MR. DONAHOE:**  If you get to that level, and

14    then there is a two-level reduction either for acceptance

15    or under the 3553, and I have a police officer from

16    Memphis here -- and I'll put this on the record, if you

17    want -- he sat down with him voluntarily and gave him the

18    information on a murder in Memphis that pointed him in

19    the right direction.  They know who it is now, but that

20    person is under federal indictment in Memphis, and they

21    can't move forward until that case concludes.  And he's

22    here and he will tell you that.  So it only moves it down

23    two from what the guideline level would be, Your Honor.

24    And I'm not -- I don't know, I don't mean to be

25    disrespectful.  Your Honor departed on the codefendant

                         UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                            85

1    Angela Bass by more levels than that when Your Honor

2    sentenced her to 66, so I don't think it's outside the

3    realm of reasonableness of what the court might do

4    anyway.

5             **THE COURT:**  Mr. Wilson, what's your take on

6    all this?  Let me ask a preliminary question.  The PSR

7    right now starts out with a base offense level of 32 as I

8    recall.

9             **MR. DONAHOE:**  Correct.

10            **MR. WILSON:**  Yes, sir.

11            **THE COURT:**  And obviously that's what you are

12   trying to establish, the quantity of drugs.

13            **MR. DONAHOE:**  Yes, sir.

14            **MR. WILSON:**  Yes, sir.

15            **THE COURT:**  So are you going to be willing to

16   concede that the quantity falls within the base offense

17   level of 26?

18            **MR. WILSON:**  On the charge alone, Your Honor,

19   the conspiracy of more than a hundred kilograms --

20            **MR. DONAHOE:**  26.

21            **MR. WILSON:**  -- is a level 26.

22            **THE COURT:**  What is that, 3D --

23            **MR. WILSON:**  2D1.1.

24            **MR. DONAHOE:**  2D1.1.

25            **THE COURT:**  I've already got it marked.

UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                      86

1          **MR. WILSON:**  It should be between 100 and

2     400 kilograms.

3          **MR. DONAHOE:**  That's correct.

4          **THE COURT:**  Of course the PSR found it to be

5     what, more than a thousand?

6          **MR. DONAHOE:**  Yes, sir, based on that big

7     shipment.

8          **THE COURT:**  On the big quantity of –– that's

9     going to be the one that's up in the air.

10          **MR. DONAHOE:**  Yes, sir, that's correct.

11          **THE COURT:**  All right.  So you are willing to

12     concede then that the base offense level should fall

13     under 2D1.1(c)(7)?

14          **MR. WILSON:**  For these purposes.

15          **THE COURT:**  That's what it is?

16          **MR. WILSON:**  For these purposes, yes, sir.

17          **THE COURT:**  And you are willing to include the

18     enhancement for obstruction?

19          **MR. DONAHOE:**  What I have explained to my

20     client is that we, from our viewpoint, should not

21     necessarily look at the adjustment and enhancements or

22     non-enhancements but look at it from the standpoint of

23     what his guideline currently is, what our recommendation

24     to the court would be, so he's not as concerned with the

25     typical calculation as we once might have been because of

UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                  87

1    that.  I can also tell Your Honor that, and Your Honor

2    may want to do this on the record, he's willing to look

3    at and address any waiver of any issues including the

4    2255 motion.

5              **THE COURT:**  Obviously, waiver of appeal?

6              **MR. DONAHOE:**  Yes, sir, did that.  We did that

7    in the plea agreement.

8              **THE COURT:**  That's in the plea agreement?

9              **MR. WILSON:**  Yes, sir, for these purposes, my

10   basis would be level 26 for the drug quantity.  I want

11   the guidelines to adequately reflect the threats that we

12   plan to present on members of the court staff as well as

13   show that the defendant has not accepted responsibility

14   as obstructive of justice and acted as a manager,

15   supervisor as included in the PSR.  And I think that this

16   is a resolution that includes all of that.

17             **THE COURT:**  What sentence did Ms. Bass get?

18             **MR. WILSON:**  66 months.

19             **THE COURT:**  Who was the other fellow?

20             **MR. DONAHOE:**  67.

21             **THE COURT:**  He was somewhat of a

22   cooperating --

23             **MR. WILSON:**  Kelsey Robinson, yes, sir.

24             **THE COURT:**  -- witness.

25             **MR. DONAHOE:**  I'm sorry, you didn't have one,

                        UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                      88

1    but there was another sentence that had 70.

2         **THE COURT:**  Was that one of the other same

3    people involved?

4         **MR. DONAHOE:**  Yes, sir.

5         **MR. WILSON:**  Victor Forest.

6         **MR. DONAHOE:**  You've had 66, 67 and 70.

7         **THE COURT:**  The only real concern I have about

8    it –– and I don't know if "concern" is the right word.

9    The only question I have about it has to do with the

10   obstruction of justice.  That obviously causes me great

11   concern when there are allegations that a defendant in

12   custody is actually undertaking steps to at least make it

13   appear that he's going to take action against prosecutors

14   or defense attorneys or judges or whoever else.

15        **MR. DONAHOE:**  May I address that, Your Honor?

16        **THE COURT:**  Sure.

17        **MR. DONAHOE:**  My argument on that would have

18   been that it doesn't make sense that Fred would do that,

19   and here's why:  He had already pled guilty.  We had a

20   specific conversation on more than one occasion about ––

21   once again, no disrespect to Your Honor, but on Judge

22   Breen's type of sentencing and the way he handles it and

23   the way he handles defendants, and I've given him a

24   general idea about that and that I thought that was

25   favorable to him that he was charged in this jurisdiction

UNREDACTED TRANSCRIPT

1    versus a lot of his codefendants that were charged in

2    Memphis under Judge Mays.

3                **THE COURT:**  Right.

4                **MR. DONAHOE:**  So we had that discussion.  He

5    has been -- he immediately sat down -- when they notified

6    me of the situation, I got him in, they brought him over,

7    we sat down and we immediately, same afternoon, with

8    about five different agencies, sat down with him and he

9    gave a full statement about everything that he had

10   been -- they may differ on whether or not he told them

11   the complete truth or not, but we sat down with them

12   immediately that afternoon because I wanted to try to

13   diffuse any issue as far as any needed protection or

14   something like that, and I had a long conversation with

15   him before we did that.  Then he sat down and went

16   through everything with them.  They have not charged him

17   with any of what the --

18                **THE COURT:**  I know.

19                **MR. DONAHOE:**  -- him having the capability to

20   do that.  I can only tell Your Honor from my experience

21   with dealing with defendants over a 30-year, almost

22   30-year career, I cannot imagine he had remotely the

23   ability to do something like that.

24                **THE COURT:**  You know, it certainly could have

25   been a certain amount of blustering, and you have that

*DIRECT – RUSTY COLON*                                                90

1    kind of thing, but --

2         **MR. DONAHOE:**  I think if what was reported

3    from the facility by the -- all I know is a confidential

4    informant -- if what was reported by them was accurate, I

5    cannot imagine, and it would very much fit his

6    personality to do that.

7         **THE COURT:**  Well, let me say, too, part of my

8    concern comes from not only this situation, but we've got

9    another instance recently where similar allegations came

10   up that were investigated in another jurisdiction and

11   there was some reason to believe that they were --

12        **MR. DONAHOE:**  Possible.

13        **THE COURT:**  -- possible.  There were

14   definitely threats made.  The question is could this

15   person or these people have the ability to pursue it, and

16   I just don't want it to become commonplace in these

17   Memphis institutions, they think it's okay to make these

18   statements, and there is consequences to it.

19        **MR. DONAHOE:**  Yes, sir.

20        **THE COURT:**  That's the last thing we want.  We

21   don't want the attitude to become it is okay to threaten

22   your prosecutor or defense attorney or whoever, court

23   staff anywhere.

24        **MR. DONAHOE:**  Certainly.  I have a good

25   relationship with this defendant and I have had from the

UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                    91

1   beginning.  I have never –– he's never said a cross word

2   to me, never accused me of not doing something or to do

3   this or to do that.  It's unusual actually.  Most of the

4   defendants at least you get a confrontation with them on

5   occasion, but it has not happened at all with me in this

6   case.

7            **THE COURT:**  All right.  Mr. Wilson, I guess

8   what I'm going to want from you then is basically an

9   unconditional recommendation that you believe this is a

10  fair and accurate sentence under the circumstances of the

11  case.

12           **MR. WILSON:**  If I can make a phone call?

13           **THE COURT:**  Okay.  I think I can go on and

14  state I don't necessarily think it's a bad resolution for

15  sentencing.

16           **MR. DONAHOE:**  Thank you, Your Honor.

17           **THE COURT:**  Had everything gone against

18  Mr. Cole, certainly the sentence would have been greater.

19  I think I can say that without any reservation.

20           **MR. DONAHOE:**  We had that conversation, Your

21  Honor.

22           **THE COURT:**  But, you know, there is still some

23  issues that would have to be decided as far as the

24  enhancements, even as far as the base offense level, that

25  will have to be decided.  So that could affect the

UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                           92

1   ultimate outcome and ultimate sentence.  But if what you

2   are going to propose is that he will basically receive in

3   excess of twice the length of the sentence that anyone

4   else has received in this matter, then that would appear

5   to me to appropriate based on the information we

6   currently have, and you indicate you are going to present

7   some mitigating information for me to consider, and

8   certainly I'll consider that.

9            **MR. DONAHOE:**  Yes, sir.  We had that to

10  present.  Unless Your Honor needs me to put that in, I

11  don't intend to do it other than make the statement on

12  the record.  Mr. Wilson is aware of it.  The agent from

13  Memphis is here.

14           **THE COURT:**  Okay.  Do you need to make a call?

15           **MR. WILSON:**  Five minutes?

16           **THE COURT:**  Okay.

17           **MR. DONAHOE:**  Let's take another about five or

18  ten-minute recess.

19           (The following occurred in open court:)

20           **THE COURT:**  All right.  Emily, we are going to

21  need to take another short recess, if you will recess for

22  about ten minutes.

23           **THE CLERK:**  All rise, please.  This Honorable

24  Court stands in recess.

25           (Recess).

UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                    93

1          **THE COURT:**  Do we need to have a side bar?

2          **MR. WILSON:**  Yes, Your Honor.

3          (The following occurred at the bench:)

4          **THE COURT:**  Okay.  Where are we?

5          **MR. WILSON:**  Your Honor, I've spoken with my

6     superiors.  I'm not authorized to continue in the

7     direction of the 151-month sentence.  Mr. Ivy came up and

8     spoke with Mr. Donahoe, and an offer of 188 months was

9     made, but it's my understanding that at this time we need

10    to proceed with the sentencing.

11         **MR. DONAHOE:**  I don't know what to tell you,

12    Judge.  I thought we had a deal, but we don't.

13         **THE COURT:**  Let me mention one other situation

14    to you.  Both of you may have been aware of this, but

15    because of problems with the building, we basically are

16    going to have to be out of here by 4:00, no later than

17    4:15.

18         **MR. WILSON:**  Yes, sir.

19         **THE COURT:**  Which obviously means we are not

20    going to finish today.

21         **MR. DONAHOE:**  Yes, sir.

22         **THE COURT:**  So we can go on until 4:00 or 4:15

23    if you would like to do that, but I'm going to have to

24    reset it, and the problem with that is going to be it's

25    going to probably be three weeks before I can get back up

UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                          94

1    here because of other matters, trials that I've already

2    got set.

3              **MR. DONAHOE:**  The only request I would have,

4    Your Honor, would be to –– I have a Memphis police

5    officer under subpoena.  I would like to –– his testimony

6    probably would be 10, 15 minutes tops.  I just would like

7    to call him if we could.

8              **THE COURT:**  Let's see how much proof we can

9    get through.  How many more witnesses?

10             **MR. WILSON:**  This is my last witness, Judge,

11   yes, sir.

12             **THE COURT:**  And you would be ready to call

13   your –– how many more?

14             **MR. DONAHOE:**  I can call ––

15             **THE COURT:**  You think you will still have two?

16             **MR. DONAHOE:**  Yes, sir.

17             **THE COURT:**  Okay.  Well, all right.  If it

18   will work out, we will proceed.

19             (The following occurred in open court:)

20             **THE COURT:**  All right.  Mr. Wilson, you can

21   proceed.

22             **MR. WILSON:**  Yes, sir.

23                      DIRECT EXAMINATION

24   **BY MR. WILSON:**

25   *Q.*    Tell us your name, sir.

                      UNREDACTED TRANSCRIPT

1   A.    Special Agent Rusty Colon, C-O-L-O-N, FBI Memphis.

2   Q.    Were you working with the FBI back in November and

3   December of this year?

4   A.    That's correct.

5   Q.    I'm sorry, of last year.

6   A.    That's correct, sir.

7   Q.    In the of course of your duties with the FBI, did

8   you become familiar with the defendant, Frederick Cole?

9   A.    I did, sir.

10  Q.    How specifically did you become familiar with him?

11  A.    I was notified to contact the United States Marshal

12  Service Inspector, Chris Crozier, regarding a threat

13  against federal officials in the Western District of

14  Tennessee.

15  Q.    What did you learn from Deputy Inspector Crozier?

16  A.    That allegations had been made that Mr. Cole had

17  made threating comments against Judge Breen, AUSA Jerry

18  Kitchen and TFO Rodney Weaver and some defense attorneys.

19  Q.    Was it your understanding that Inspector Crozier

20  had received information from two confidential sources?

21  A.    Yes, sir, originally I think it was one, but later

22  on a second one was determined.

23  Q.    And these sources were also in federal custody with

24  the defendant who is awaiting sentencing?

25  A.    That's my understanding, yes, sir.

UNREDACTED TRANSCRIPT

*DIRECT − RUSTY COLON*                                              96

1  Q.   How many days into the investigation that was

2  parallel conducted by Inspector Crozier did you become

3  involved?

4  A.   It was either the second, third, fourth day; second

5  or third day roughly.

6  Q.   Is it fair to say that you and he worked the threat

7  investigation jointly and parallel to each other?

8  A.   Yes, sir, after that third day, I was −− I had a

9  family situation, but I was pretty much there with them

10  every day.

11  Q.   And after you got up with Inspector Crozier, tell

12  me what proceeded?

13  A.   A proffer of Mr. Cole was conducted under this

14  original narcotics case.  I sat in on that but I didn't

15  really participate.  I didn't ask any questions of any

16  magnitude.  That was on the 1st, I believe, Thursday,

17  December 1st.

18  Q.   Yes, sir.

19  A.   And then on the 2nd, Mr. Cole was questioned again.

20  It was made clear to him by Special Agent Whitman of the

21  DEA as well as myself and Inspector Crozier that this

22  interview was separate from his proffer agreement, and we

23  wanted to ask him about a new issue as we started asking

24  questions about this threat issue at that time.

25  Q.   Okay.  What specifically did Mr. Cole tell you

*DIRECT - RUSTY COLON*                                                    97

1    regarding the threat allegations?

2            **MR. DONAHOE:**  Your Honor, I would like to

3    interpose an objection at this time.  He was questioned,

4    and they are asking him about any statements that he

5    made, and the Sixth Amendment right to counsel hadn't

6    attached at this point.  They knew I represented him.

7    They knew it was connected to this case, would have an

8    impact on this case, yet they interviewed him without any

9    notice to me.

10           **THE COURT:**  Well, are you objecting to the

11   testimony or just to the -- isn't that just something I

12   need to weigh in considering the testimony?

13           **MR. DONAHOE:**  I'm objecting to the testimony.

14   They are attempting to introduce statements made by my

15   client having been in custody the entire time and

16   represented by counsel when he was questioned without

17   counsel.

18           **THE COURT:**  All right.  Mr. Wilson, what's the

19   government's position?

20           **MR. WILSON:**  Your Honor, I believe that -- I'm

21   not sure on the new investigation, as Agent Colon

22   testified to, that Mr. Cole was represented by counsel in

23   that charge on the threat investigation.  I believe

24   that's the first -- the December 1st interaction was some

25   sort of proffer agreement.  On December 2nd there was an

UNREDACTED TRANSCRIPT

*DIRECT - RUSTY COLON*                                                98

1  interview on the new allegations.  I'm not sure there has

2  been any --

3           THE COURT:  Do we know if Mr. Cole was

4  Mirandized again or not?

5           THE WITNESS:  He was on December 2nd, yes,

6  sir, Your Honor, he was.  On the second interview on the

7  2nd he was Mirandized by Inspector Crozier.

8           MR. DONAHOE:  It would not necessarily matter,

9  Your Honor.  It's a Sixth Amendment issue.  Counsel --

10  the right had already attached.  He already was

11  represented and wouldn't matter if they Mirandized him 50

12  times.

13           THE COURT:  Well, it could.  That's not

14  necessarily an accurate statement, but it could be.

15           MR. DONAHOE:  And they're certainly attempting

16  to use it now against him in this case.

17           THE COURT:  Well, that's the problem I have.

18           I think I'm going to have to sustain the

19  objection.

20           MR. WILSON:  Well, Your Honor, if I may just

21  briefly address that, I know Your Honor has made its

22  ruling, but I ask Your Honor to consider one thing; if

23  Mr. Donahoe was appointed in this case and Mr. Cole was

24  interviewed about separate allegations in another case,

25  I'm not sure that Mr. Donahoe represented him for those

UNREDACTED TRANSCRIPT

1    actions, Your Honor.

2            **THE COURT:**  That's why I said it may or may

3    not be a Sixth Amendment issue.  That's why I asked if he

4    had been Mirandized again.

5            **MR. WILSON:**  Yes, sir.  And I believe its use

6    here, now that it is a separate issue from Mr. Donahoe's

7    representation on him on a certain issue at that time, on

8    December 2nd, he was not represented by Mr. Donahoe or

9    anyone on the threat investigation.  It's separate and

10   collateral.  And while the two come together now and we

11   are introducing it for his sentencing in this case, I

12   believe that's a separate issue as to his being

13   represented at the time, and Agent Colon says he was in

14   fact advised of his right to counsel, which I don't

15   believe he invoked at that time on the new allegations.

16           **MR. DONAHOE:**  You may have admissibility in a

17   new prosecution if new charges are brought against him

18   for some type of threat being made.  It may be admissible

19   in that scenario.  But to go in and interview him and

20   then come into this court in this case where he was

21   represented and attempt to introduce the testimony is

22   just wrong.

23           **THE COURT:**  Well, it's not, Mr. Donahoe, it's

24   not a question of right and wrong, it's a question of

25   were his rights violated.  The concern I have is what

UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                          100

1    Mr. Donahoe is raising –– were you involved, Mr. Donahoe,

2    were you involved in the December 1st meeting?

3              **MR. DONAHOE:**  No, Your Honor.

4              **THE COURT:**  You weren't involved in the

5    proffer?

6              **MR. DONAHOE:**  I'm sorry, Your Honor?

7              **THE COURT:**  You weren't involved in the

8    proffer session?

9              **MR. DONAHOE:**  Yes, sir, but that did not occur

10   at that time.

11             **THE COURT:**  I thought it was December 1st.

12             **MR. DONAHOE:**  That was ––

13             **THE COURT:**  Did I misunderstand?

14             **MR. DONAHOE:**  They interviewed my client out

15   of my presence and then later advised me and asked to

16   interview him again, which we did.  But when they –– the

17   first one or two times they talked to him, I was not

18   present and was not told.  Then they come to me later and

19   say, hey, we want to interview him based on these

20   allegations.  Well, they should have done that to start

21   with.

22             **THE COURT:**  So you weren't involved in the ––

23             Agent Colon, did you testify there was a

24   proffer, I thought you testified there was a proffer?

25             **MR. DONAHOE:**  I'm sorry.  I misunderstood Your

                     UNREDACTED TRANSCRIPT

*DIRECT — RUSTY COLON*                                          101

1    Honor.  There was a proffer made in this case on the

2    facts surrounding this case on the 1st.  I was involved

3    in that proffer.  I apologize, yes, sir, I was.  My

4    fault, yes, sir.  But they interviewed him the next day

5    on the threats I was not involved in.  Then some time

6    later I was advised of the threats.  They wanted to

7    interview him again, but for some reason this time, which

8    is what they should have done the first time, they wanted

9    counsel present.

10              **THE COURT:**  Anything else, Mr. Wilson?

11              **MR. WILSON:**  No, Your Honor.

12              **THE COURT:**  Well, the problem I'm having is

13   the reason I asked if he was Mirandized again, it would

14   appear to me that these were separate allegations, which

15   they apparently are.  Then the government could Mirandize

16   him and he would have the right, Mr. Cole would have the

17   right to speak or not speak, depending on what he chose

18   to do.  So I don't necessarily have a problem with that,

19   but the only concern I have now is it's being used in

20   this prosecution —— not in the prosecution, in the

21   sentencing, and I'm trying to recall if there is any

22   distinction in the Sixth Circuit authority between

23   conviction stage and sentencing phase as far as whether

24   that should be allowed to come in or not.  And I seem to

25   recall that there is some distinction that's made between

*DIRECT - RUSTY COLON*                                                    102

1   how this type of information can be used depending on

2   whether it's the guilt phase or sentencing phase.

3             I'm going to let you testify.  I note your

4   objection, Mr. Donahoe, but I'm going to hear what he has

5   to say, and then I'll decide how much weight to give it.

6             All right.  Go ahead, Mr. Wilson.

7        **MR. WILSON:**  Thank you.

8   **BY MR. WILSON:**

9   *Q.*    The defendant told you initially he denied the

10  allegations, is that true?

11  *A.*    That's correct.

12  *Q.*    Did he admit he was angry with Jerry Kitchen and

13  Rodney Weaver?

14        **MR. DONAHOE:**  Objection, leading.

15        **THE COURT:**  Reask the question.

16  **BY MR. WILSON:**

17  *Q.*    Did he mention those two individuals?

18  *A.*    Yes, Mr. Cole mentioned AUSA Kitchen as well as

19  Task Force Officer Weaver, and he made it very clear that

20  he did not like those individuals personally and he felt

21  as though lots of folks locked up did not like those

22  individuals.

23  *Q.*    Did he state -- let me ask, does the name Fish have

24  any significance to you?

25  *A.*    Yes, it does.

UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                     103

1   *Q.*    How does it have significance in this case?

2   *A.*    Crozier, Inspector Crozier, CI, when he relayed

3   this information about Mr. Cole making these threatening

4   statements said that Mr. Cole said that it would be very

5   easy, all he would have to do is have –– and I'm

6   paraphrasing, I don't remember the exact words, I don't

7   have notes in front of me, but that it would be very

8   easy, all you have to do is ––

9           **MR. DONAHOE:**  Your Honor, could I object at

10  this point?  I understand hearsay is somewhat admissible

11  here, but we got hearsay on top of hearsay on top of

12  hearsay here.  We are coming from a CI through another

13  agent through another agent.  At what point does it

14  become unreliable?

15          **THE COURT:**  Well, that's what the court has to

16  evaluate, Mr. Donahoe, and I'll take all that into

17  consideration.  I think he can testify to this.

18          Go ahead.

19          **THE WITNESS:**  That it would be very, very easy

20  for him to have somebody look up the information on the

21  Internet, and that he has –– he knows a guy named Fish

22  and Fish has taken care of things before.

23  **BY MR. WILSON:**

24  *Q.*    Okay.  Look up what sort of things on the Internet?

25  *A.*    Home addresses.

                        UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                    104

1  *Q.*    Of whom?

2  *A.*    Of understood to be AUSA Kitchen, TFO Weaver and

3  others involved in the prosecution.

4  *Q.*    Was Angela Bass interviewed by Mr. Crozier and

5  yourself?

6  *A.*    Angela Bass was interviewed on Saturday,

7  December 2nd.  It was on Saturday.  I believe that was

8  the 2nd.

9  *Q.*    Do you have any reason to dispute the 3rd, if the

10  Thursday was the 1st?

11  *A.*    Thursday was the 1st.  Friday was the 2nd.

12  *Q.*    So Angela Bass was interviewed on a date in

13  December?

14  *A.*    Yes, sir.

15  *Q.*    Okay.  And what did Ms. Bass tell you regarding the

16  threats?

17  *A.*    We interviewed Ms. Bass at her home and advised her

18  that we were aware of these threats and asked her if she

19  knew anything about it to which Ms. Bass ultimately told

20  us, in fact, on a visitation to CCA Mason, that Fred had

21  told her to look up the home addresses of Jerry Kitchen

22  and TFO Weaver and I believe a couple of defense

23  attorneys and to hide that information behind a picture

24  frame in the home that she was staying in.

25  *Q.*    Did she express any –– did she know, seem to know

UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                    105

1    or tell you about any knowledge about what that

2    information was for?

3    A.    She went back and forth.  Essentially she said she

4    couldn't be sure, she thought maybe they were going to --

5    she was going to be utilized to embarrass or save it for

6    a rainy day but to embarrass those individuals, to

7    discredit their credibility.

8    Q.    Did she say that Mr. Cole had made any statement,

9    specific quote about these individuals, Weaver and Jerry

10   Kitchen and the other individuals?

11   A.    That he did not like them.

12   Q.    You don't remember any specific threats that she

13   said that he told her?

14   A.    I would have to see my 302.

15   Q.    Would that help refresh your recollection?

16   A.    Of Ms. Bass, sure.

17            **MR. DONAHOE:**  What are we looking at?

18            **THE COURT:**  What is this, Mr. Wilson?

19            **MR. WILSON:**  This is a December 3rd FBI police

20   report, also called a 302, about Angela Bass's interview.

21            **THE COURT:**  Is he just using it to refresh his

22   memory?

23            **MR. WILSON:**  Yes, sir.

24            **THE COURT:**  Okay.

25            **THE WITNESS:**  It's my --

                    UNREDACTED TRANSCRIPT

*DIRECT - RUSTY COLON*                                        106

1           **THE COURT:**  Hold on.

2           **THE WITNESS:**  -- report of Ms. Bass --

3           **THE COURT:**  Hold on one second.  Is there an

4   objection or something?

5           **MR. DONAHOE:**  I just don't have it.  I haven't

6   seen it.

7           Thank you, Your Honor.  I just ask to have it

8   available when I examine the witness.

9           **THE COURT:**  Go ahead, Mr. Wilson.

10  **BY MR. WILSON:**

11  *Q.*   Agent Colon, I believe I asked you about specific

12  words that were used to Angela Bass, do you recall the

13  specific words from reviewing your records there?

14  *A.*   Yes, sir.  Ms. Bass told us that during Mr. Cole's

15  anger that he said he was going to get them.  When he

16  said "them," she believed he was referring to TFO Weaver

17  and AUSA Kitchen, those involved in the prosecution.

18  *Q.*   Did Ms. Bass mention anything about Fish to you?

19  *A.*   Yes, we asked Ms. Bass if he knew an individual

20  named Fish.  She said she did know an individual named

21  Fish.  She said she believed his real name was Anthony

22  Jackson and he lived on Scott Street in the Dyersburg

23  area.  That was pretty much what she told us about Fish.

24  Oh, I'm sorry, she told us that approximately two or

25  three weeks prior to our interview, that Mr. Cole had

UNREDACTED TRANSCRIPT

*DIRECT - RUSTY COLON*                                                        107

1    asked her to get Fish's phone number and have it

2    available whenever he called her so she could three-way

3    him to Fish.  And she told us that she did do that at

4    some point, she did, you know, Mr. Cole called and she

5    did three-way that call to Fish.

6    *Q.*    So she admitted making a phone call that Mr. Cole

7    was included on to this individual named Fish?

8    *A.*    Yes.

9    *Q.*    Did any of the details of her statement, were any

10   of the details of her statement similar to that provided

11   by the CS?

12   *A.*    They were very close, yes.

13   *Q.*    In what way?

14   *A.*    What the CI, you know, said that, that he overheard

15   Mr. Cole say that all he has to do is have somebody look

16   up the home addresses.  She said she was told to look up

17   the home addresses.  The CI mentioned the Western

18   District of Tennessee officials that would be involved.

19   She told us it was for Kitchen and TFO Weaver and I

20   believe Dianne Smothers, who were involved in the

21   prosecution of this case.

22   *Q.*    Did she admit in this statement or later to looking

23   up the information of Judge J. Daniel Breen?

24   *A.*    She advised that at some point -- I think it was at

25   a different interview, but that she did look up Judge

UNREDACTED TRANSCRIPT

*DIRECT − RUSTY COLON*                                              108

1    Breen's address, but then she said it was to send

2    information, you know, regarding their sentencing or

3    something of that nature, but she thought maybe it wasn't

4    a good idea to be sending it to a home address, so she

5    didn't.

6    *Q.*    Did both your agency and from your observations of

7    the actions of the marshal service take these allegations

8    seriously?

9    *A.*    Very seriously.

10   *Q.*    Why so?

11   *A.*    There was corroborating statements.  There was

12   evidence indicating that a threat had been made.  As far

13   as we knew, there could have been somebody looking to

14   harm these individuals that were involved in the

15   prosecution.

16   *Q.*    Did the apparent existence of Fish or a third party

17   other than Mr. Cole and Ms. Bass have any bearing on your

18   assessment of the threat?

19   *A.*    Sure, yes, it did, of course.

20   *Q.*    Why is that?

21   *A.*    Well, that information corroborated those

22   statements, and that for all we know, there could have

23   been an individual out there looking to do danger that we

24   were unaware of.

25   *Q.*    From your interaction and in working in conjunction

                          UNREDACTED TRANSCRIPT

*DIRECT – RUSTY COLON*                                                       109

1   with Inspector Crozier, what did the marshal service do

2   in reaction to this threat?

3   *A.*    The marshal assigned 24/7 protection on Judge

4   Breen, AUSA Kitchen and I believe Ms. Smothers.

5   *Q.*    For a several-week period?

6   *A.*    For an extended time period, I would say at least

7   two weeks.

8   *Q.*    From your communications and understanding with

9   Inspector Crozier, was this an expensive proposition?

10  *A.*    It was.

11  *Q.*    Did both the FBI headquarters and the marshal

12  service headquarters in Washington have to get involved

13  in some of the decision making and assignments in this

14  case?

15  *A.*    I know the marshal service had headquarters

16  personnel involved.  I reported directly to my

17  supervisor.  I don't know if it went any higher than our

18  field office level with the bureau.

19  *Q.*    On December, on December the 6th, was another

20  interview conducted by yourself and Deputy Marshal

21  Crozier of another confidential source at Mason?

22  *A.*    Well, yes, sir.

23  *Q.*    What did that confidential source advise regarding

24  any similar allegations?

25  *A.*    That he, too, had overheard Mr. Cole make

UNREDACTED TRANSCRIPT

*DIRECT - RUSTY COLON*                                         110

1   statements indicating that he was very upset with the

2   prosecution of himself and Ms. Bass and that, you know,

3   that he could have their home addresses located and, you

4   know, utilize people to harm them.

5   *Q.*    Do you have a 302 from that interview or did Deputy

6   Marshal Crozier prepare that?

7   *A.*    There is a -- I have a 302 on that one.

8   *Q.*    Can you find that?  I'll show counsel.

9            **MR. DONAHOE:**  Now what are we looking at?

10           **THE COURT:**  He's looking for his notes from

11   the interview on December 6th.

12           **MR. WILSON:**  Your Honor, the report that Mr --

13   that Agent Colon has contains an individual's name, and I

14   don't mind showing it to -- or paraphrasing it for

15   counsel, but I'm worried about that name being

16   disseminated here in court.

17           **THE COURT:**  Mr. Donahoe, are you agreeable

18   with that?

19           **MR. DONAHOE:**  Oh, I don't mind bringing up the

20   name of the person that's in the report, Your Honor.  I

21   have no objection to that.

22           **THE COURT:**  You mean redacting?

23           **MR. WILSON:**  Your Honor, I have a solution.

24   The state of the law as I understand it is the witness

25   may be refreshed with things other than their own report.

UNREDACTED TRANSCRIPT

*DIRECT — RUSTY COLON*                                                    111

1   I believe the presentence report adequately summarizes

2   the December 6th interview and ask to refresh the

3   witness's recollection with that.  It's from his report.

4               **THE COURT:**  Mr. Donahoe?

5               **MR. DONAHOE:**  I agree.  I think he can do

6   that, Your Honor.

7               **THE COURT:**  All right.  Pass the presentence

8   report to the witness.

9               **MR. DONAHOE:**  Can you reference a paragraph

10  number, please?

11              **MR. WILSON:**  Number 35.

12              **THE WITNESS:**  That sounds about right.

13  **BY MR. WILSON:**

14  *Q.*    From reviewing that paragraph, sir, do you agree

15  with the information?

16  *A.*    Absolutely.

17  *Q.*    And do you recall that information, that this is

18  consistent, this paragraph is consistent with the

19  interview that took place on December 6th?

20  *A.*    I would agree with that, yes, sir.

21  *Q.*    Sir, was Angela Bass on December the 12th, I guess,

22  confronted in any way by yourself and Deputy Marshal

23  Crozier?

24  *A.*    Yes.

25  *Q.*    Did you all ask her to take a polygraph test?

                    UNREDACTED TRANSCRIPT

*DIRECT - RUSTY COLON*                                                    112

1    *A.*    We did.

2    *Q.*    At that point did her demeanor and her actions

3    change?

4    *A.*    She agreed to take it.

5    *Q.*    Okay.  Did her story change after that?

6              **MR. DONAHOE:**  Objection.  I mean polygraph

7    test, Your Honor?  I mean I know there is some leeway

8    here, but still that's got to be inadmissible.

9              **MR. WILSON:**  I'm not asking about the results,

10   Judge.

11             **THE COURT:**  What are you asking, Mr. Wilson?

12             **MR. WILSON:**  After she was confronted and took

13   the test, how her demeanor and how her actions changed.

14             **THE COURT:**  So you are not asking about the

15   results of the test?

16             **MR. WILSON:**  No, sir.

17             **THE COURT:**  All right.  Overruled.  Go ahead.

18             **THE WITNESS:**  Inspector Crozier and TBI

19   Detective Valerie Trout interviewed Ms. Bass before the

20   polygraph examination and afterwards.

21   **BY MR. WILSON:**

22   *Q.*    In the interview afterwards, was her demeanor

23   different?

24   *A.*    Yes.

25   *Q.*    Did she -- was she, I guess, approached by law

UNREDACTED TRANSCRIPT

*DIRECT - RUSTY COLON*                                                113

1    enforcement at that time as an -- openly approached as a

2    suspect?

3    *A.*    Yes.

4            **MR. WILSON:**  I don't have any further

5    questions, Your Honor.

6            **THE COURT:**  All right.  Mr. Donahoe?

7            **MR. DONAHOE:**  Thank you, Your Honor.

8                          CROSS-EXAMINATION

9    **BY MR. DONAHOE:**

10   *Q.*    Agent, would you please find the correct -- in your

11   report or booklet or whatever you got there, the Angela

12   Bass statement.  I don't want to go rummage through your

13   stuff.

14   *A.*    Yes, sir, I understand.  I'll go straight to it.

15   *Q.*    And will you follow that down so that only that

16   part of the statement --

17   *A.*    I can take it out, if you would like.

18   *Q.*    Thank you.  Agent, I take it that you did not

19   directly talk with the persons who began this

20   investigation or the CI who started this thing off?

21   *A.*    That's correct, sir, I did not.

22   *Q.*    These persons were incarcerated at the facility?

23   *A.*    It's my understanding.

24   *Q.*    At Mason?

25   *A.*    Yes, sir, that's my understanding.

                          UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                              114

1    Q.    Do you have any idea what they are charged with?

2    A.    I will be speculating.  I think I remember, but I

3    couldn't quote a hundred percent to be sure.

4    Q.    Best of your recollection?

5    A.    I think it was narcotic offenses, but I couldn't --

6    Q.    Because they were at Mason, they would have been

7    pretrial, right?

8    A.    That's my understanding.

9    Q.    It is a typical procedure of the FBI, when they

10   take a statement from either a witness or potential

11   suspect to do a written rights waiver form?

12   A.    From?

13   Q.    Either a witness or a suspect, particularly a

14   suspect.

15   A.    In custody.

16   Q.    Was Mr. Cole in custody when you talked to him

17   without me present?

18   A.    He was in custody for these charges, yes, sir.

19   Q.    Okay.  So he was in custody.  So did you obtain a

20   written rights waiver form from him at that time prior to

21   interviewing him on the issues that are now in front of

22   this court?

23   A.    Inspector Crozier did, yes.

24   Q.    Do you have that?

25   A.    I would have to see if the government has it.  I do

UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                                      115

1    not have it.

2    *Q.*    Okay.  I sure don't have it.

3              **THE COURT:**  You can't testify, Mr. Donahoe.

4    Let's ask -- I mean if you want to question him about

5    whether it's been provided or if he has it or not, then

6    obviously you can do that but --

7              **MR. WILSON:**  Thank you.

8              **THE COURT:**  -- don't testify.

9              **MR. DONAHOE:**  Yes, sir.

10   **BY MR. DONAHOE:**

11   *Q.*    Do you know where it is, Agent Colon?

12   *A.*    Either with the marshal service or -- I don't have

13   it, no.  I mean I would be speculating once again.  He

14   was given his rights, and he did sign to them.

15   *Q.*    And the procedure would be to write down -- FBI

16   procedure is to take down the statement, write the

17   statement down and let the person then who is giving the

18   statement sign at the end?

19   *A.*    Not necessarily.

20   *Q.*    Pardon me?

21   *A.*    On a written statement?

22   *Q.*    Yes.

23   *A.*    No, not necessarily.

24   *Q.*    You would take it down, would you not?

25   *A.*    Take down his statement?

UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                            116

1    Q.    Yes.

2    A.    Yes, sir.

3    Q.    Where is that?

4    A.    His interview that I recorded?

5    Q.    Yeah.

6    A.    I have it here.

7    Q.    Can you find that for me --

8    A.    Yes, sir.

9    Q.    -- please?

10          **MR. DONAHOE:**  May I have a moment, Your Honor?

11          **THE COURT:**  Okay.

12   **BY MR. DONAHOE:**

13   Q.    Agent, this report indicates that Mr. Cole was

14   given a polygraph examination; is that correct?

15   A.    He was.

16   Q.    And you have the results of that?

17   A.    I do.

18          **MR. DONAHOE:**  I would ask the court that I be

19   allowed to obtain a copy of that information.  That has

20   not been produced for me.

21          **THE COURT:**  Well, earlier you objected to its

22   admissibility.

23          **MR. DONAHOE:**  I just want to see my client's

24   polygraph.

25          **THE COURT:**  You may can, but you don't need to

                    UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                          117

1    see it right now, do you?

2              **MR. DONAHOE:**  No, sir.

3              **THE COURT:**  I'm not saying you can't see it.

4    I'm just saying you don't need to see that to continue

5    your cross.

6              **MR. DONAHOE:**  I do not, and I did not intend

7    to state that.  I merely ask the court to allow -- I

8    guess I'm asking for the court to approve that I obtain

9    that or I be allowed to have a copy of that.

10             **MR. WILSON:**  Let's see if you and Mr. Wilson

11   can't resolve that, and if you can't, I'll take it up.

12             **MR. DONAHOE:**  Understood, Your Honor.  All

13   right.

14   **BY MR. DONAHOE:**

15   *Q.*    During your interview with Fred Cole on December

16   the 6th, Mr. Cole denied making any specific threats to

17   to anyone, correct?

18   *A.*    That's correct.

19   *Q.*    He did say -- and I believe you testified earlier

20   that he was not fond of the first -- I'm sorry -- the

21   original United States Attorney who was handling the

22   case, Jerry kitchen, or Agent Weaver, would that be

23   accurate?

24   *A.*    He made it very clear he did not like them.

25   *Q.*    Would it be safe to say there are a lot of people

                    UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                              118

1    incarcerated at Mason that would not like those people?

2    A.    That's what Mr. Cole told us.

3    Q.    And based on your other experience, would it be

4    correct to say that you've heard other defendants make

5    the same statements, have you not?

6    A.    I don't recall hearing the defendants say that, but

7    I mean common sense would say that's an accurate

8    statement.

9    Q.    He told you who Anthony Jackson was, Fish?

10   A.    That's correct.

11   Q.    Didn't have any hesitation about that?

12   A.    No, sir.

13   Q.    He also told you that he was interested in

14   information regarding Weaver due to a shooting incident

15   he was involved in sometime in the nineties, agree?

16   A.    He did tell us something of that nature.

17   Q.    He denied being affiliated with any gangs, correct?

18   A.    He denied being affiliated with any gangs.

19   Q.    At the time that you interviewed him, you were

20   aware that he had already pled guilty on a drug charge

21   and was awaiting sentencing at that time?

22   A.    Uh-huh, yes, sir.

23   Q.    There was some additional animosity towards Kitchen

24   in that Mr. Cole believed that when his father passed

25   away that Mr. Kitchen had blocked his ability to go to

UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                                    119

1   that funeral, accurate?

2   A.    Mr. Cole said something of that nature, yes, sir.

3   Q.    He denied that he believed in retaliating against

4   people who did wrong to him, you agree with that?

5   A.    That's what he told us.

6           **MR. DONAHOE:**  May I approach, Your Honor?

7           **THE COURT:**  Okay.

8           **MR. DONAHOE:**  I'm going to give you back this

9   one so I don't lose it.  I'm just going to ask Mr. Wilson

10  if he'll provide me a copy of that at a later time.

11  **BY MR. DONAHOE:**

12  Q.    Certainly you went to the computer that may have

13  been used by Ms. Bass to determine whether or not it was

14  actually used and could support or not support the

15  allegations made?

16  A.    Yes, sir, we served a search warrant at her home

17  address and seized I think a thumb drive or two, a

18  computer, a laptop, I believe is accurate.

19  Q.    I believe it was said that Mr. Wilson asked you if

20  Mr. Cole had asked for a three-way conversation with Fish

21  through Ms. Bass; did I get that right?

22  A.    Ms. Bass told us that Mr. Cole in one of their many

23  conversations recently, you know, prior to the interview,

24  had requested that she obtain Fish's phone number and

25  have it available so when he calls, that she could

UNREDACTED TRANSCRIPT

*CROSS − RUSTY COLON*                                                        120

1    three−way.

2    *Q.*    And he also told you that that was because Fish's

3    cousin was incarcerated at Mason with him, correct?

4    *A.*    No.

5    *Q.*    And isn't it also true −−

6    *A.*    That's not, no, we weren't told that by Ms. Bass or

7    Mr. Cole.

8    *Q.*    So Ms. Bass never stated that when the three−way

9    happened −−

10   *A.*    I'm sorry, I'm getting my folks mixed up.  I

11   believe that's accurate.  I believe that's accurate.  I'm

12   sorry.  I got my people mixed up.

13   *Q.*    Let's try it again.  So Ms. Bass confirmed to you

14   that what Fred Cole said to her was, I want the number

15   because his cousin is incarcerated in Mason with me?

16   *A.*    I believe Fish told us that.

17   *Q.*    Okay.  Somebody told you that?

18   *A.*    Right, I believe it was Fish.  I don't want to

19   misspeak, sir.  I believe it was Fish.

20   *Q.*    Ms. Bass then described the telephone conversation

21   where there actually was a three−way conversation when

22   Mr. Cole had called?

23   *A.*    She told us that she connected him, but she set the

24   phone down and has no idea of what was discussed.

25   *Q.*    She also told you that before she set the phone

                              UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                                    121

1    down she heard Fish's cousin come on the line, didn't

2    she?

3    A.    I have to review that 302, sir.  If I wrote that

4    down, then I would say yes.

5          I recall she made the connection.  She listened for

6    approximately 10 to 15 seconds and set the phone down.

7    Q.    Last paragraph, page 3.  She heard Mr. Cole give

8    the phone to the cousin?

9    A.    That's correct, except I have nephew here.

10   Q.    I'm sorry, I meant nephew.  I've been saying

11   cousin, and I've been meaning nephew the whole time.

12   A.    I understand, sir.

13   Q.    So we can't say whether or not Mr. Cole ever

14   actually talked to Fish, can we?

15   A.    Mr. Cole talked to Fish.

16   Q.    Uh-huh.  He didn't talk to him on this occasion

17   because he handed the phone to Fish's nephew, right?

18   A.    According to Ms. Bass, yeah, but we talked to Fish

19   as well, and Fish said that he did in fact speak to

20   Mr. Cole.

21   Q.    But he denied Cole asked him to do anything

22   inappropriate; isn't that true?

23   A.    That's correct, yeah, but they did speak.

24   Q.    Fish has not been arrested for doing anything

25   wrong?

UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                                        122

1   A.    In regards to this case, no, not in regards to this

2   case.  He may be in custody right now.

3   Q.    That was poorly asked.  I'm sorry.  In regard to

4   the allegations of any threats made against any public

5   official, he has not been arrested?

6   A.    Not in regard to this specific investigation, no,

7   sir.

8   Q.    Neither has Mr. Cole?

9   A.    Mr. Cole has not been charged, no, sir.

10  Q.    There was an allegation at some point that some

11  information that Ms. Bass supposedly put together was

12  supposed to be placed behind a picture in somebody's

13  house, do you remember that?

14  A.    Yes, sir.

15  Q.    Surely you seized that picture, right?

16  A.    We stuck to the search warrant.  We looked and we

17  did not find anything behind a picture, if that's what

18  you are asking.  Ms. Bass also told us in that interview

19  that she didn't do it, that she listened to him say that

20  and that she just listened to him so he could vent and

21  cool down, and she didn't actually follow through.

22  Q.    Angela Bass also told you in the initial interview

23  that Fred frequently says stuff just to blow off steam?

24  A.    She did say that.

25  Q.    She said that on more than one occasion, do you

UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                                    123

1   agree --

2   A.    She told --

3   Q.    -- in the interview?

4   A.    I mean, you are looking at it.  I'll take your word

5   that's what it says.

6   Q.    She advised that she listens to him when he's in a

7   mood like that but doesn't take him seriously, you agree

8   with that statement?

9   A.    Sounds familiar.

10  Q.    In this interview in this statement she said that

11  she told you in this interview she didn't know what Cole

12  was going to do with the addresses, correct?

13  A.    She speculated, but correct.

14  Q.    No, I'm sorry, maybe I asked that poorly.  In the

15  interview Ms. Bass stated to you she does not know what

16  Cole is going to do with the addresses, correct?

17  A.    She speculated, but he did not give her specific

18  directions as to what he was going to do with the

19  addresses.

20  Q.    How is she speculating that she didn't know what he

21  was going to do with them?

22  A.    I believe she -- I believe if you read on she

23  speculates maybe they were going to use it for

24  blackmailing purposes or something of that nature.

25  Q.    Right.  I'm not saying this very well.  Let me get

UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                              124

1    back to my original question.

2    A.    I'm not understanding, sir.

3    Q.    Four paragraphs in, statement, you wrote it down,

4    Bass does not know what Cole was going to do with the

5    addresses; would that be correct?  You need to see it?

6    A.    Sure.

7    Q.    Fourth paragraph, first line.  What does it say?

8    A.    What you said, that was Ms. Bass' statement.

9    Q.    She also said that Cole did not tell her to give

10   the addresses to anyone, do you agree?

11   A.    That is what she told us.

12   Q.    Did you verify that she was at the correctional

13   facility on the day that she alleges the conversation

14   took place?

15   A.    No, we do not have a record of that.

16   Q.    You didn't verify that?

17   A.    Did not verify that.  I didn't.  I don't know if

18   Inspector Marshal did or Inspector Crozier did or not.

19   Q.    You are not aware of anybody that did?

20   A.    I can't recollect, no, sir.  I can't remember if he

21   did.

22   Q.    She told you in the interview in December the 3rd

23   that she did not research any of the names, didn't find

24   out or print out any of the addresses, correct?

25   A.    She told us that she was instructed to but did not.

*CROSS - RUSTY COLON*                                                125

1   Q.    Ms. Bass also told you she did not know of anything

2   Cole had ever done violent before?  That's what she said?

3   A.    I believe that's what she said.  That sounds

4   familiar, yes, sir.

5   Q.    And do you know from the investigation that

6   Ms. Cole -- I'm sorry -- Mr. Cole, Ms. Bass have lived

7   together for some time?

8   A.    Yes, sir.

9   Q.    And they have children together?

10  A.    That's what we were told.

11  Q.    You certainly -- you attempted to establish the

12  three-way conversation was actually made from her cell

13  phone, right?

14  A.    Yes, sir.

15  Q.    And was she able to produce that for you?

16  A.    No, she couldn't find it.

17  Q.    She couldn't even produce the phone call she

18  alleges happened, right?

19  A.    She said it wasn't in her phone, couldn't find it.

20  Q.    Certainly you subpoenaed her phone records to

21  verify that?

22  A.    We had jail tapes.  The jail tapes were listened to

23  extensively.  They were not located.  That call was not

24  located.

25  Q.    So the call -- as far as you are concerned, that

UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*

126

1  call never happened?

2  A.    I believe the call happened.  I can't find a record

3  of it, if that's what you are asking.

4  Q.    You can't find any supporting phone call?  Every

5  phone call coming out of the penal facility is taped, is

6  it not?

7  A.    That's correct.

8  Q.    And you've listened to all of them?

9  A.    I haven't listened to any.  Folks on this

10  investigation have.

11  Q.    Folks on this investigation expended a lot of time

12  looking for that phone call?

13  A.    Looking for lots of phone calls.

14  Q.    How about this one, let's talk about it.

15  A.    That was part of it, sure.

16  Q.    In this one that we are talking about where Angela

17  Bass claims that Fred Cole had conversations with Fish

18  never happened -- I'm sorry -- it never happened as far

19  as any supporting recording or documentation, do you

20  agree?

21  A.    No, I will say we did not locate any recordings or

22  documentation.  I don't think that means it doesn't

23  exist.  Maybe we just didn't find the right time frame or

24  something of that nature.

25  Q.    Are you telling me you think there is a phone call,

UNREDACTED TRANSCRIPT

*CROSS – RUSTY COLON*                                              127

1   a tape out there that somebody has not reviewed that we

2   just missed it, that the FBI just missed it?

3   *A.*    No, sir, what I'm saying is maybe the times were

4   wrong, but it wasn't located.

5              **MR. DONAHOE:**  May I have just a moment, Your

6   Honor?

7              **THE COURT:**  All right.

8              **MR. DONAHOE:**  I will also request, if

9   possible, this Angela Bass statement I just referenced be

10  produced as, be produced for my records also.

11             **MR. WILSON:**  No objection.

12             **THE COURT:**  All right.

13  **BY MR. DONAHOE:**

14  *Q.*    Ms. Bass in her statement also denied that Mr. Cole

15  ever asked her to provide an address on Judge Breen, do

16  you agree?

17  *A.*    Yes, I agree with that.

18  *Q.*    The sources that you are aware of that brought this

19  all to light have not been able to name an individual

20  outside of Mason who was actually supposed to do this

21  harm to these people, correct?

22  *A.*    Inspector Crozier's CI named Fish.

23  *Q.*    And you interviewed Fish.  Is he the only person

24  that we actually have a name?

25  *A.*    I feel confident that that's the correct Fish.

UNREDACTED TRANSCRIPT

*CROSS - RUSTY COLON*                                                    128

1   *Q.*    I'm sorry.  I asked that poorly.  Let me ask it

2   again.  Other than this person who these sources name as

3   Fish, which you believe you found the right guy?

4   *A.*    We believe so.

5   *Q.*    Other than Fish, has there ever been any name

6   brought to light by any of these sources?

7   *A.*    No, sir.

8   *Q.*    And Fish denied knowing anything about it or having

9   anything to do with anything, right?

10  *A.*    That's what he said.

11          **MR. DONAHOE:**  Thank you, Your Honor.

12          **THE COURT:**  Any redirect?

13          **MR. WILSON:**  Yes, Your Honor.

14                  REDIRECT EXAMINATION

15  **BY MR. WILSON:**

16  *Q.*    Agent Colon, on not being able to provide any

17  names, was the initial CS of Inspector Crozier able to

18  provide the names of the court officials?

19  *A.*    I believe he was, yes, sir.

20  *Q.*    Specifically, Judge --

21  *A.*    Kitchen, Judge Breen.

22  *Q.*    -- Judge Breen?

23  *A.*    -- and I believe Weaver.

24  *Q.*    Are you also aware of a December the 20th interview

25  with Frederick Cole?

UNREDACTED TRANSCRIPT

*REDIRECT - RUSTY COLON*                                            129

1    *A.*    I know one happened, but I wasn't present.

2    *Q.*    Okay.  You have a copy of that report, do you not,

3    that involves Special Agent Jason Cardone?

4    *A.*    I do not have it.

5            **MR. WILSON:**  Your Honor, I don't have any

6    further questions for this witness.  Agent Cardone

7    probably should be in the stairwell, Your Honor, to talk

8    about what's in paragraph number 38.  I know -- if I can

9    just inquire of Mr. Donahoe, I know that the defense has

10   objected to several paragraphs over to paragraph 39.  I'm

11   asking if the defendant is objecting to the facts

12   contained in paragraph 38.

13           **THE COURT:**  Of the PSR?

14           **MR. DONAHOE:**  Can I check just a second?

15           **THE COURT:**  Okay.

16           **MR. DONAHOE:**  We have no objection to

17   paragraph 38, Your Honor.

18           **MR. WILSON:**  Then I don't have any further

19   proof, Your Honor, or further questions for the witness.

20           **THE COURT:**  All right.  Thank you, you can

21   step down.

22           (Witness excused).

23           **THE COURT:**  All right.  Counsel, as I

24   indicated to you, we are going to have to wrap up for the

25   afternoon here in about the next -- well, within the next

                     UNREDACTED TRANSCRIPT

 1    15 or 20 minutes.  I know, Mr. Donahoe, you said you've

 2    got a witness that you need to get on this afternoon?

 3              **MR. DONAHOE:**  If the court will allow me, I

 4    would like to call Sgt. Taylor.

 5              **THE COURT:**  All right.  Is he outside?

 6              **MR. DONAHOE:**  Yes, sir, he is.

 7              **THE COURT:**  If you don't mind, ask him to come

 8    in now.  Counsel, let's talk about when we are going to

 9    come back to finish the sentencing hearing.

10              Emily, if you would pull up my calendar.

11              If we are going to be on a Friday, it's going

12    to be at least three weeks and possibly four before I can

13    be back because of other matters that are already

14    scheduled.  It did occur to me that I think I had a

15    matter that was set for this coming Monday that had been

16    canceled, and I could possibly continue with it on

17    Monday.  Let's let Emily check to be sure first.

18              **THE CLERK:**  The calendar is clear for Monday.

19              **THE COURT:**  I don't know if that's possible

20    for either one of you or not.

21              **MR. WILSON:**  Your Honor, I have a jury trial

22    next door with Judge Breen starting Monday morning.

23              **THE COURT:**  Well, I guess that knocks that out

24    then.  So we will be looking at a Friday.  Let's see, can

25    we look at -- let's see, I've got criminal rotation the

UNREDACTED TRANSCRIPT

1    first two weeks, right?

2              **THE CLERK:**  I'm not showing anything on the --

3              **THE COURT:**  Unfortunately I know I do.  And in

4    that third week is the conference.

5              **THE CLERK:**  27th?

6              **THE COURT:**  What's that third week, what's the

7    Friday on that third week?

8              On the 20th, we can possibly do it on the 20th

9    or looks like either the 20th or possibly the 27th.

10             **MR. WILSON:**  Either of those dates would be

11   fine, Your Honor.

12             **MR. DONAHOE:**  I'm available both.

13             **THE COURT:**  Well, you want to go on and set it

14   for the 20th then?  I would assume sooner would be

15   better.

16             **MR. DONAHOE:**  Yes, sir.

17             **MR. WILSON:**  Yes, sir.

18             **THE COURT:**  So what we will plan to do is

19   resume the hearing, and if there is any additional proof

20   to be heard, or if not, then obviously we are going to

21   have to go through and address each one of the objections

22   on the record separately, so we will have -- that will

23   take some time to do that.  So we will plan to resume on

24   July the 20th at 9:30 a.m. back in this courtroom unless

25   you are notified otherwise, okay.

                    UNREDACTED TRANSCRIPT

1              **MR. DONAHOE:**  Yes, sir.

2              **THE COURT:**  All right.  Now, where is your

3    witness, Mr. Donahoe?

4              **MR. DONAHOE:**  He's present, Your Honor.

5              **THE COURT:**  Ask him to come around, if you

6    would.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*REDIRECT - RUSTY COLON*                                              133

1              **ISRAEL TAYLOR,**

2    having been first duly sworn, took the witness stand and

3    testified as follows:

4                          DIRECT EXAMINATION

5    **BY MR. DONAHOE:**

6    *Q.*    State your name and spell it for the record,

7    please?

8    *A.*    First name is Israel, I-S-R-A-E-L; last name

9    Taylor, T-A-Y-L-O-R.

10   *Q.*    What is your position?

11   *A.*    I'm a homicide sergeant employed by the Memphis

12   Police Department in Memphis, Tennessee.

13   *Q.*    How did you first come in contact with Fred Cole?

14   *A.*    I was contacted by the U.S. Marshal Service in

15   Jackson.  They had gotten word that there was an inmate

16   in federal custody who wanted to provide information on

17   an unsolved homicide in our city.

18   *Q.*    Did you then make arrangements to come up to

19   Jackson to meet with him?

20   *A.*    I did.

21   *Q.*    We met together, did we not?

22   *A.*    We did, yes, sir.

23   *Q.*    You were able to speak with Mr. Cole freely and ask

24   any questions you wanted in regard to that?

25   *A.*    Yes, sir.

                          UNREDACTED TRANSCRIPT

*DIRECT – ISRAEL TAYLOR*                                                134

1    Q.    Would you relate to the court did he give you any

2    information?

3    A.    Mr. Cole did not provide –– he was not an

4    eyewitness to the homicide.  He provided us with the name

5    of a fellow inmate for us to contact who may or may not

6    have information relevant to that homicide.  We did make

7    contact with the inmate that Mr. Cole, the name he

8    provided.  That inmate did provide information regarding

9    that homicide, however, that investigation stalled due to

10   circumstances beyond my control and certainly beyond

11   Mr. Cole's control.

12   Q.    And that person that you are speaking about is

13   currently incarcerated on federal charges?

14   A.    Yes, sir.

15   Q.    Mr. Cole's information that he gave you proved to

16   be accurate and helpful in your investigation?

17   A.    Yes, sir.

18              **MR. DONAHOE:**  Thank you.  That's all I have,

19   Your Honor.

20              **THE COURT:**  All right, Mr. Wilson.

21                          CROSS–EXAMINATION

22   **BY MR. WILSON:**

23   Q.    The circumstances beyond your and Mr. Cole's

24   control was due to a lack of any potential consideration

25   by another prosecutor; is that correct?

                        UNREDACTED TRANSCRIPT

*CROSS - ISRAEL TAYLOR*                                                        135

1   *A.*    That's correct, yes, sir.

2   *Q.*    And that prosecutor, has that prosecutor

3   represented to you that there will be no consideration

4   given to that witness?

5   *A.*    I don't remember exactly what was -- I don't

6   remember his words exactly, but he conveyed to me in no

7   uncertain terms at this moment there is nothing that's

8   going to be done.

9              **MR. WILSON:**  Thank you, Your Honor.

10             **THE COURT:**  Any redirect?

11             **MR. DONAHOE:**  No, Your Honor.  Thank you.

12  Thank you for the courtesy of allowing me to call that

13  witness.

14             **THE COURT:**  All right.  Sergeant, you can step

15  down.

16             **THE WITNESS:**  Thank you.

17             (Witness excused).

18             **THE COURT:**  Mr. Donahoe, do you wish to call

19  any other witnesses in the next 15 minutes?

20             **MR. DONAHOE:**  I don't have a 15-minute

21  witness, Your Honor.

22             **THE COURT:**  Do you have other witnesses you

23  are going to want to call?

24             **MR. DONAHOE:**  Yes, sir.

25             **THE COURT:**  I assumed you were through with

                         UNREDACTED TRANSCRIPT

1    your case in chief, Mr. Wilson?

2            **MR. WILSON:**  Yes, sir.

3            **THE COURT:**  Then, Counsel, what we will do is

4    plan to come back on the 20th at 9:30.  We will resume at

5    that time.

6            Mr. Donahoe, can you have your witnesses

7    available on that date?

8            **MR. DONAHOE:**  Yes, sir.

9            **THE COURT:**  Okay.  All right.  Then we will

10   come back on the 20th and resume the sentencing for

11   Mr. Cole.  Is there anything else before we adjourn?

12           **MR. WILSON:**  Yes, Your Honor, before we go

13   into recess I have contained on one disk, and I've told

14   Mr. Donahoe, the calls that were had played in court here

15   today with the government's witness are contained on a

16   disk as Exhibit 1 for the Court, if Your Honor would take

17   those into evidence at this time.

18           **THE COURT:**  Yeah, we will admit that as the

19   next exhibit, I guess it will be the first exhibit.

20           **THE CLERK:**  Yes.

21           (Said item was marked as Exhibit 1).

22           **THE COURT:**  Again, I take it, Mr. Wilson, that

23   you don't have those calls transcribed and you don't have

24   any plans to have them transcribed at this point?

25           **MR. WILSON:**  No, Your Honor.

                    UNREDACTED TRANSCRIPT

1          THE COURT:  Well, I may -- I may order that it

2    be transcribed.  Some of it -- and I'll try to listen to

3    it again probably just see if I can hear it clearer maybe

4    under different circumstances.  Sometimes these

5    courtrooms are not very conducive to hearing clearly

6    what's being said on something like a CD.  But that may

7    be helpful or may not be.  I'll see what I can do just

8    with what I have and then decide if I need to have it

9    transcribed.

10          All right.  Anything else, Mr. Wilson?

11          MR. WILSON:  No, Your Honor.

12          THE COURT:  Mr. Donahoe, anything else?

13          MR. DONAHOE:  Not at this time, Your Honor.

14          THE COURT:  All right.  We will reconvene then

15    on July the 20th at 9:30 a.m.

16          THE CLERK:  All rise, please.  This Honorable

17    Court now stands adjourned.

18          (Adjournment).

19

20

21

22

23

24

25

1

2                       C E R T I F I C A T E

3        I, Mark S. Dodson, do hereby certify that the

4    foregoing 137 pages are, to the best of my knowledge,

5    skill and ability, a true and accurate transcript from my

6    stenotype notes in the matter of:

7

8    UNITED STATES

9    vs.

10   FREDERICK COLE

11

12        Dated this 15th day of December, 2012.

13

14   S/**Mark S. Dodson**
     Official Court Reporter
15   United States District Court
     Western District of Tennessee
16

17

18

19

20

21

22

23

24

25

                        UNREDACTED TRANSCRIPT